[No. B162023. Second Dist., Div. Seven. July 24, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNELL WYNE SMITH, Defendant and Appellant.

**COUNSEL**

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc E. Turchin and Robert David Breton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PERLUSS, P. J.**—Johnell Wyne Smith was convicted after a jury trial of residential burglary. The jury also found true the special allegation that Smith had suffered two prior juvenile adjudications for robberies committed when he was 16 years old.[1] Based on the jury's findings, Smith was sentenced as a third strike offender to an aggregate term of 30 years to life in state prison.

Relying on *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] (*Apprendi*) and *United States v. Tighe* (9th Cir. 2001) 266 F.3d 1187 (*Tighe*), Smith's sole contention on appeal is that it was unconstitutional to sentence him under California's "Three Strikes" law based on his prior juvenile adjudications because he was denied the right to a jury trial in the juvenile court proceedings.[2] ■ We believe Smith's argument misapprehends *Apprendi* and *Tighe* and hold, as has Division Four of our court in *People v. Bowden* (2002) 102 Cal.App.4th 387 [125 Cal.Rptr.2d 513] (*Bowden*), that a juvenile adjudication may be used as a strike to enhance an adult offender's sentence notwithstanding the absence of the right to a jury trial in delinquency proceedings.

I. *Apprendi and Tighe Concern the Appropriate Allocation of Fact-Finding Responsibilities Between Judge and Jury, Not the Nature or Scope of Sentence Enhancement Factors*

In *Apprendi* the United States Supreme Court invalidated a New Jersey "hate crime" statute that provided for an "extended term" of between 10 and

---

[1] Prior to submitting the issue to the jury in a unitary trial, the trial court found beyond a reasonable doubt, based on fingerprint identification evidence, that Smith was the individual listed in the California Youth Authority documents introduced to prove the prior juvenile adjudications.

[2] Although Smith's trial counsel asked the court to dismiss the prior strike adjudications in the interests of justice pursuant to Penal Code section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628], on appeal Smith does not argue the trial court abused its discretion by declining to do so. Accordingly, we do not address our dissenting colleague's concern that the trial court may not have properly applied the factors articulated in *People v. Williams* (1998) 17 Cal.4th 148, 161 [69 Cal.Rptr.2d 917, 948 P.2d 429] (in deciding whether to dismiss a prior conviction, trial court should consider "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes] scheme's spirit, in whole or in part"). We note, however, the issue of the appropriate standard of appellate review of a trial court's decision declining to dismiss a prior conviction for purposes of sentencing under the Three Strikes law is currently pending before the Supreme Court. (*People v. Carmony*, review granted May 21, 2003, S115090.)

20 years of imprisonment if the trial judge found, by a preponderance of the evidence, that certain felonies were committed " 'with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' " (*Apprendi, supra,* 530 U.S. at pp. 468–469.) The defendant had been convicted of two counts of possession of a firearm for an unlawful purpose, which had a sentencing range of five to 10 years. He was sentenced on one of those counts. Acting under the hate crime statute, the trial court found the defendant had intended to intimidate his victims because of their race and added another 12 years to the defendant's sentence. ■ The *Apprendi* court treated the crime, together with its sentence enhancement, as the "functional equivalent" of a single "greater" crime and held the federal Constitution requires that all elements of a crime must be submitted to a jury and proved beyond a reasonable doubt. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.)

The California Supreme Court has succinctly explained *Apprendi* in the following terms: "This is what *Apprendi* teaches us: Except for sentence enhancement provisions that are based on a defendant's prior conviction, the federal Constitution requires a jury to find, beyond a reasonable doubt, the existence of every element of a sentence enhancement that increases the penalty for a crime beyond the 'prescribed statutory maximum' punishment for that crime. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 326 [109 Cal.Rptr.2d 851, 27 P.3d 739].)

In *Tighe* the Ninth Circuit considered both facial and as-applied constitutional challenges to a provision of the Armed Career Criminal Act (18 U.S.C. § 924(e)) (ACCA), which mandates a minimum sentence of 15 years for any person who violates the federal felon-in-possession statute and who has three prior convictions for violent felonies or serious drug offenses. After affirming the district court's holding that ACCA is constitutional on its face, a divided panel held that prior juvenile adjudications do not fall within the "fact of a prior conviction" exception to *Apprendi*'s general rule that all elements used to increase a defendant's maximum penalty must be submitted to a jury and proved beyond a reasonable doubt. (*Tighe, supra,* 266 F.3d at p. 1194.)

In reaching this result, the *Tighe* court emphasized language from *Jones v. United States* (1999) 526 U.S. 227, 249 [143 L.Ed.2d 311, 119 S.Ct. 1215], a case which preceded *Apprendi*: " 'One basis for that constitutional distinctiveness [of prior convictions] is not hard to see: unlike virtually any other consideration used to enlarge the possible penalty for an offense … a prior

conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt and jury trial guarantees.' [Citation.] Thus, *Jones'* recognition of prior convictions as a constitutionally permissible sentencing factor was rooted in the concept that prior convictions have been, by their very nature, subject to the fundamental triumvirate of procedural protections intended to guarantee the reliability of criminal convictions: fair notice, reasonable doubt and the right to jury trial." (*Tighe, supra*, 266 F.3d at p. 1193, italics omitted.) Because juvenile adjudications do not afford jury trials and, therefore, do not meet the standard of procedural protections described in *Jones* and *Apprendi*, the Ninth Circuit concluded juvenile adjudications are not within the prior conviction exception to *Apprendi*'s general rule. (*Id.* at p. 1194.)

Contrary to the suggestion of Smith and our dissenting colleague, the two-judge majority in *Tighe* did *not* hold that the fact of a prior juvenile adjudication could not be used to enhance an adult offender's sentence or that in trying a new offense and seeking an ACCA enhancement the United States Attorney was required to present to the jury all the evidence that supported the earlier juvenile determination. Rather, *Tighe* held only that, under *Apprendi*, to enhance an adult offender' s sentence the fact of the prior juvenile adjudication must be presented to a jury and proved beyond a reasonable doubt. (*Tighe, supra*, 266 F.3d at pp. 1194–1195.)[3] Indeed, the majority specifically acknowledged that "defendants might be prejudiced if their prior juvenile adjudications are presented to the jury," but noted that the district courts could fashion procedures to mitigate any prejudice to the defendant. (*Tighe,* at pp. 1194–1195, fn. 5.)[4]

## II. *Juvenile Adjudications May Properly Be Considered "Strikes" Notwithstanding the Absence of Jury Trials in Delinquency Proceedings*

■ Under California's Three Strikes law a qualifying juvenile adjudication may be used as a strike to increase the sentence of an adult offender.

---

[3] Similarly, in *United States v. Smalley* (8th Cir. 2002) 294 F.3d 1030, 1032, the Court of Appeals considered only the question whether "juvenile adjudications" "can be characterized as prior convictions as that term is used in *Apprendi* [so that] they can be used to increase the penalty for a crime beyond the prescribed statutory maximum *without being submitted and proved to a jury*." (Italics added.)

[4] Because we are not in any event bound by decisions of the lower federal courts, even on federal questions (*People v. Cleveland* (2001) 25 Cal.4th 466, 480 [106 Cal.Rptr.2d 313, 21 P.3d 1225]; *People v. Avena* (1996) 13 Cal.4th 394, 431 [53 Cal.Rptr.2d 301, 916 P.2d 1000]), our disagreement with our dissenting colleague as to the holding of the divided panel in *Tighe* is purely academic. There can be no dispute that nothing in the Supreme Court's decision in *Apprendi* itself precludes the California Legislature from classifying juvenile adjudications involving serious or violent offenses as strikes for purposes of enhancing an adult offender's sentence.

(Pen. Code, §§ 667, subd. (d)(3), 1170.12, subd. (b)(3);[5] *People v. Garcia* (1999) 21 Cal.4th 1, 4–5 [87 Cal.Rptr.2d 114, 980 P.2d 829].) The dissent argues the more critical inquiry for purposes of a jury determination is whether Smith actually engaged in the criminal conduct that gave rise to the prior adjudications, not whether he was adjudicated of having committed the offenses. However, nothing in *Apprendi* or the cases upon which it relied limits the Legislature's authority to identify a prior juvenile adjudication involving a serious or violent offense or any other fact it deems reasonably relevant for purposes of imposing an increased sentence (see, e.g., *People v. Flores* (1986) 178 Cal.App.3d 74, 88 [223 Cal.Rptr. 465] [legislative determinations regarding length of punishment evaluated under rational basis standard]), provided the existence of the elements it has specified for sentence enhancement (other than a prior conviction) are submitted to a jury and found to exist beyond a reasonable doubt. (See *People v. Sengpadychith, supra,* 26 Cal.4th at p. 326.)

"[I]n our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments ... such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch* (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921].) "The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will ...." (*Id.* at p. 423.) "Reviewing courts ... should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes" (*Solem v. Helm* (1983) 463 U.S. 277, 290 [77 L.Ed.2d 637, 103 S.Ct. 3001].)

In the Three Strikes law the Legislature chose to rely on the fact that the defendant, when 16 years of age or older, had been adjudicated to have committed a serious or violent offense (§§ 667, subd. (d)(3),[6] 1170.12, subd. (b)(3)). "A prior juvenile adjudication of a section 667, subdivision (d)(3)(B) offense demonstrates beyond a reasonable doubt [citation] that a defendant has engaged in serious criminal behavior in the past. ■ By reoffending, a defendant shows he had failed to draw the proper lesson from the previous judicial determination that he violated the law. This failure

---

[5] Statutory references are to the Penal Code unless otherwise indicated.

[6] Section 667, subdivision (d)(3), provides in part: "A prior juvenile adjudication shall constitute a prior felony conviction for purposes of sentence enhancement if: [¶] (A) The juvenile was 16 years of age or older at the time he or she committed the prior offense." Section 1170.12, subdivision (b)(3), contains the same limitation to juvenile offenses committed at the age of 16 or older. Justice Johnson thus employs, perhaps understandably, a bit of hyperbole when he refers in his dissenting opinion to qualifying strikes " 'earned' [by] young teenagers in proceedings where they lacked the fundamental constitutional right to trial by jury." (Dis. opn., *post,* at p. 1092.)

warrants harsher punishment in the adult proceeding. [Citation.]" (*People v. Fowler* (1999) 72 Cal.App.4th 581, 587 [84 Cal.Rptr.2d 874].) A qualifying juvenile adjudication must be pleaded and proved beyond a reasonable doubt (§§ 1170.12, subd. (a), 667, subd. (c); *People v. Tenner* (1993) 6 Cal.4th 559, 566 [24 Cal.Rptr.2d 840, 862 P.2d 840] ), and the defendant has a statutory right to jury trial on the issue of whether he or she suffered the prior adjudication (§ 1025, subd. (b); see *People v. Epps* (2001) 25 Cal.4th 19, 26–27 [104 Cal.Rptr.2d 572, 18 P.3d 2]).[7]

" 'By enacting the three strikes law, the Legislature has ... simply ... said that, under specified circumstances, a prior juvenile adjudication may be used as evidence of past criminal conduct for the purpose of increasing an adult defendant's sentence.... Since a juvenile constitutionally—and reliably (*McKeiver v. Pennsylvania* [(1971) 403 U.S. 528, 547] [29 L.Ed.2d 647, 91 S.Ct. 1976])—can be adjudicated a delinquent without being afforded a jury trial, there is no constitutional impediment to using that juvenile adjudication to increase a defendant's sentence following a later adult conviction.' " (*Bowden, supra,* 102 Cal.App.4th at p. 392, quoting *People v. Fowler, supra,* 72 Cal.App.4th at pp. 585–586.)[8]

Accordingly, even if we were to adopt the *Tighe* majority's analysis, there would be no error in this case. Smith was in fact afforded the right to have a jury determine the question whether he had sustained a prior qualifying adjudication under the Three Strikes law, and the jury found the allegation to be true. Indeed, Smith, testifying on his own behalf at trial, admitted the juvenile court had sustained a delinquency petition alleging he had committed two robberies.[9] He cannot now complain that use of his prior juvenile adjudications violated *Apprendi.*

---

[7] Section 1025, subdivision (b), provides: "... the question of whether or not the defendant has suffered the prior conviction shall be tried by the jury that tries the issue upon the plea of not guilty, or in the case of a plea of guilty or nolo contendere, by a jury impaneled for that purpose, or by the court if a jury is waived."

[8] As Justice Johnson readily acknowledges in his dissenting opinion, in light of nearly 80 years of precedent beginning with *In re Daedler* (1924) 194 Cal. 320 [228 P. 467], only the California Supreme Court can now reconsider the question whether the California Constitution confers a right to a jury trial in juvenile court proceedings.

[9] Pursuant to section 1025, subdivision (c), the trial court, not the jury, determined that Smith was the person who had suffered the prior juvenile adjudications for robbery. Smith does not argue he was misidentified or that the trial court erred in concluding the fingerprint evidence established this fact beyond a reasonable doubt. Accordingly, even if there were error in this case under the *Tighe* analysis, any such error would be harmless beyond a reasonable doubt. (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 326 [*Apprendi* error evaluated under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (federal constitutional error requires proof of harmlessness beyond a reasonable doubt); see *Ring v. Arizona* (2002) 536 U.S. 584, 609, fn. 7 [153 L.Ed.2d 556, 122 S.Ct. 2428] (*Apprendi* extended to include finding of aggravating factors necessary to impose death

### III. *Any Unfairness in Continued Use of Juvenile Adjudications as Strikes Is Properly Addressed by the Legislature*

Our dissenting colleague aptly describes the increasing convergence of the adult and juvenile justice systems. Even so, as Justice Kennard explained in her dissenting opinion in *Manduley v. Superior Court* (2002) 27 Cal.4th 537 [117 Cal.Rptr.2d 168, 41 P.3d 3], the purposes of the juvenile system and adult courts and the consequences of adverse determinations in adult and juvenile proceedings remain markedly different: "The juvenile court system and the adult criminal courts serve fundamentally different goals. The punishment for serious crimes tried in the criminal courts is imprisonment, and 'the purpose of imprisonment for crime is punishment.' [Citation.] California Rules of Court, rule 4.410 identifies seven objectives in sentencing a criminal defendant. They include punishment, deterrence, isolation, restitution, and uniformity in sentencing, but they do not include goals important in the treatment of juvenile offenders such as maturation, rehabilitation, or preservation of the family. [¶] ... [¶] The practical consequences are immense. An adult court may sentence a defendant to life imprisonment; a juvenile court cannot impose confinement beyond the age of 25. [Citations.] Adult convictions are public but juvenile commitments are sealed [citations], a difference that affects future employability and many other matters. Adult convictions are criminal in character, and may deprive the person convicted of the right to vote [citation], to serve on a jury [citation], to carry firearms [citation] and to enter certain professions (e.g., Gov. Code, § 1029 [peace officers]); juvenile convictions carry no such collateral consequences." (*Manduley*, at p. 593 (dis. opn. of Kennard, J.).)[10]

The potential use of a juvenile adjudication as a strike under the Three Strikes law does not change the essential nature of juvenile proceedings or eliminate the significant differences between a finding of criminal guilt in an adult criminal court and a declaration of wardship by a juvenile court. (See *In re Myresheia W.* (1998) 61 Cal.App.4th 734, 741 [72 Cal.Rptr.2d

---

sentence, but leaving it to lower court in first instance to evaluate whether error was prejudicial)].)

[10] In addition, although the Legislature (and the electorate) elected to treat certain juvenile adjudications as prior felonies for purposes of the Three Strikes law, juvenile adjudications cannot be considered either a prior serious felony conviction for purposes of the mandatory five-year enhancement in section 667, subdivision (a) (*People v. West* (1984) 154 Cal.App.3d 100, 107–108 [201 Cal.Rptr. 63]), or a prior theft-related conviction for purposes of section 666, elevating petty theft to a felony. (*In re Anthony R.* (1984) 154 Cal.App.3d 772, 775–776 [201 Cal.Rptr. 299].)

65].) Nonetheless, in his dissenting opinion Justice Johnson forcefully describes the seeming injustice in classifying delinquency proceedings as something other than "criminal" trials for purposes of determining the offender's right to a jury trial while also permitting the resulting declaration of wardship to be used as a prior felony conviction for purposes of sentence enhancement if the juvenile reoffends as an adult.

That sense of fundamental unfairness is all the more notable since the electorate's approval in March 2000 of Proposition 21 (the Gang Violence and Juvenile Crime Prevention Act of 1998), which, among other significant changes to juvenile court law, authorizes prosecutors to file charges directly in adult criminal court, without a prior judicial determination the minor is unfit for a disposition under juvenile court law, against any minor who is 16 years of age or older who is accused of committing one of the serious or violent offenses listed in Welfare and Institutions Code section 707, subdivision (b). (Welf. & Inst. Code, § 707, subd. (d); *Manduley v. Superior Court, supra,* 27 Cal.4th at pp. 549–550.) In other words, at the time an accusatory pleading involving offenses that qualify as "strikes" is filed against a 16-year-old or 17-year-old offender, the prosecutor has the sole authority to determine whether to initiate the proceeding in adult criminal court or juvenile court—a decision that dictates, among other matters, whether or not the accused minor is entitled to a jury trial. Yet despite having decided to proceed against the minor in juvenile court, if the minor reoffends, the prosecutor remains free under the current version of the Three Strikes law to have the juvenile offense treated with the identical consequences as an adult conviction.[11]

■    Absent constitutional constraints, however, "when the Legislature has established policy, it is not for the courts to differ." (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 851 [25 Cal.Rptr.2d 500, 863 P.2d 745]; see *People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313].) Any meaningful response to the arguments advanced by Justice Johnson must come from the political branches of our state government.

---

[11] Of course, the assessment at the time of the initial decision to proceed in juvenile court is whether the minor appears at that time to be amendable to the care, treatment and training programs available through the facilities of the juvenile court (see Welf. & Inst. Code, § 707, subd. (a)).    ■    When the prior juvenile adjudication is pleaded and proved as a "strike" to enhance an adult offender's sentence, the focus at sentencing is whether the defendant should be treated as a recidivist in light of the nature and circumstances of his or her present felonies and prior serious offenses, as well as the particulars of the defendant's background, character and prospects. (*People v. Williams, supra,* 17 Cal.4th at p. 161.)

## DISPOSITION

The judgment is affirmed.

Munoz (Aurelio), J.* concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I respectfully dissent from the majority as to the constitutionality of imposing a "three strikes" sentence on appellant. At the same time, I emphasize the three of us agree on the central problem. We only differ on the remedy.

The majority opinion joins in recognizing "the seeming injustice in classifying delinquency proceedings as something other than 'criminal' trials for purposes of determining the offender's right to a jury trial while also permitting the resulting declaration of wardship to be used as a prior felony conviction for purposes of sentence enhancement if the juvenile reoffends." (Maj. opn., *ante*, at p. 1081.) In my colleagues' view, however, the cure for this "seeming injustice" must come from the Legislature. In my view, the injustice rises to the level of a constitutional violation and, as such, can and must be remedied by the courts. As Thomas Jefferson wrote: "*I consider that trial by jury is the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution.*"[1]

The remainder of this dissent is devoted to explaining the alternative grounds for finding present California law violates the United States and California Constitutions in denying alleged delinquents the right to jury trial in juvenile court, especially when they are charged with "strike-eligible" offenses. However, before beginning that discussion I first observe this case represents an especially questionable application of the California code provision that includes juvenile court adjudications as "strikes" under this state's "three strikes" law. Here both prior "strikes" the trial court used to justify imposing a sentence of 25 years to life on this 19-year-old "adult" resulted from a single juvenile court proceeding where the juvenile judge found the defendant, then age 16, committed two offenses on a single occasion. This scenario alone raises a serious question whether the trial court

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Thomas Jefferson, letter to Thomas Paine, July 11, 1789 (15 Papers of Jefferson (1958) 269, italics added).

abused its discretion by refusing to strike at least one of the strikes under *People v. Romero*.[2] If such a case is not "outside the [three strikes] scheme, in whole or in part"[3] it is hard to imagine what would be. At the outset, it is noteworthy appellant acquired his first two strikes in a single criminal incident, which appears to be a significant factor favoring dismissal of one of those prior convictions.[4] Moreover, here appellant's third strike was a non-violent burglary. And we have the further circumstance it is difficult to develop a lifetime pattern of recidivism at such an early age.[5]

Nonetheless, as suggested above, my concern about the *Romero* issue is not the primary reason for this dissent. Instead the objection is more fundamental and arises at the threshold—when this or any trial court counts a juvenile court "true finding" as a prior "strike," despite the absence of a right to jury trial in the juvenile delinquency proceedings where he was found to have committed that offense or offenses. In my view, the statute authorizing this practice violates both the California and United States Constitutions and the constitutional rights to jury trial these documents enshrine.

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628] (*Romero*).

[3] As articulated in a post-*Romero* decision, the test is "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed *outside the scheme's spirit, in whole or in part,* and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 [69 Cal.Rptr.2d 917, 948 P.2d 429], italics added.)

[4] See, e.g., *People v. Benson* (1998) 18 Cal.4th 24, 33–37 [74 Cal.Rptr.2d 294, 954 P.2d 557], discussing whether a conviction which has been "stayed" for purposes of punishment under Penal Code section 654 *could* count as a strike in calculating a three strikes sentence. In a four-three decision the Court held the trial courts could but are not required to treat such a conviction as a strike. In the course of that discussion, however, the high court acknowledged it *might* be an abuse of discretion for a trial court to count two convictions arising out of the same act (e.g., as in the case before this court) as two prior strikes. "[W]e need not and do not determine whether there are some circumstances in which two prior felony convictions are so closely connected—for example, when *multiple convictions arise out of a single act* by the defendant as distinguished from multiple acts committed in an indivisible course of conduct— that a trial court *would abuse its discretion* under section 1385 *if it failed to strike one of the priors.*" (*Benson,* at p. 36, fn. 8, italics added.) Considering the combination of circumstances here, this case appears a good candidate for finding an abuse of discretion in not striking one of the two juvenile adjudications defendant received for a single act of robbery.

[5] I recognize, as the majority opinion points out, appellate counsel failed to raise the *Romero* issue in his briefs. This failure means we need not address the issue if we choose not to. It does not oust us from jurisdiction, however, to raise and decide it on our own motion. Of course, to issue an opinion other than a dissent would require the court to give the parties an opportunity to brief and argue the matter. By including this mention in the dissent I am merely signaling my willingness and desire to do so—and explaining why I consider it a significant although secondary issue in the context of this case.

## I. BECAUSE OF THE DENIAL OF JURY TRIAL IN PROCEEDINGS BEFORE THE JUVENILE COURT, THE CALIFORNIA CONSTITUTION BARS USE OF JUVENILE COURT DECLARATIONS OF WARDSHIP AS PRIOR "STRIKES" WARRANTING LIFE SENTENCES WHEN CONVICTED LATER OF ADULT OFFENSES.

The California Constitution guarantees civil litigants and criminal defendants alike an "inviolate" right to trial by jury.[6] Despite this guarantee, appellant and other accused juvenile offenders are tried in juvenile court without a jury, declared wards of that court, and later made eligible for life sentences based on those wardship declarations. In my view, for reasons explained below, the use of juvenile adjudications as "strikes" for purposes of imposing two and three strike sentences violates this inviolate right guaranteed by our state's Constitution.

### A. What is the Rationale for Denying Accused Minors Their Ordinary State Constitutional Right to Jury Trial in Juvenile Court?

Once the California Supreme Court establishes a rule it is not uncommon to forget the rationale behind the rule. As time passes and memories fade and generations pass away, the rule becomes "black letter law." Sometimes this means it is followed long after the rationale erodes away—due to changes in the legal or social environment—leaving the rule naked and unsupported by logic or sound policy.

This is what happened with the Supreme Court's 1924 decision, *In re Daedler*,[7] announcing the denial of jury trials in this state's new juvenile court delinquency proceedings did not violate the right to jury trial guaranteed by our state Constitution. That rationale, questionable even when deployed to justify the Court's holding,[8] was based on a historical finding juvenile courts were not criminal courts holding criminal trials and imposing "criminal convictions" which would require guaranteeing the juvenile accused a right to jury trial. Rather those courts were functioning as courts of equity and simply deciding whether to declare the juveniles accused to be wards of the court, a process and a decision not requiring a right to jury trial under English common law—and thus not guaranteeing such a right under

---

[6] "Trial by jury is an inviolate right and shall be secured to all, ... A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.)

[7] *In re Daedler* (1924) 194 Cal. 320 [228 P. 467].

[8] See pages 1086–1087, *post*.

the California Constitution. The remaining rationale for the *Daedler* opinion was its factual finding the processes and consequences of declaring a juvenile accused a "ward of the court" were far different and much less severe than a criminal proceeding and a criminal conviction.

As demonstrated below, over the succeeding three-quarters of a century both the legal and social environment have changed so much the rationale undergirding *In re Daedler's* holding has eroded completely away. It is utter fiction a 21st century juvenile court is a court of equity merely adjudicating an accused youngster to be a "ward of the court." (*In re Daedler, supra,* 194 Cal. 320, 323 et seq.) Worse, it is a cruel hoax to characterize the fictional declaration of wardship as something other than a "criminal conviction" when deciding whether the jury trial right applies, then a few years later to characterize it as a "criminal conviction" (or at the least the equivalent of such a conviction) when deciding whether it can be used as a prior "strike" helping to justify a life sentence.

In succeeding sections, I present alternative independent and sufficient grounds for concluding the California Constitution bars use of juvenile court adjudications as prior "strikes" under the three strikes law.

First, properly analyzed, there is a right to jury trial in such proceedings and consequently any "true finding" obtained in a proceeding where the accused lacked such a right is unconstitutional and cannot be used as a prior "strike." (See section B, *post.*)

Second, assuming there is no such right to jury trial in these proceedings it is only because they are properly classified as equitable wardship proceedings and the resulting adjudications merely constitute equitable declarations of wardship. As such, they do not qualify as and cannot constitutionally be reclassified as the equivalent of "criminal convictions" supporting a subsequent three strikes sentence. (See section C, *post.*)

Third, by handing prosecutors—but not juveniles accused of "strike eligible" offenses—the option of deciding whether those juveniles are to have a right to jury trial, Proposition 21 has further undermined the fundamental policy underlying the constitutional right to trial by jury. It is unconstitutional to count a juvenile adjudication as a "strike" when a government official has chosen, for whatever reason, to force that juvenile accused into a forum where he or she lacks the right to jury trial rather than in a forum where that right is available. To do so deprives juveniles of the protection against government oppression the constitutional right to jury trial is designed to afford. (See section D, *post.*)

**B. The Supreme Court Should Reconsider the Issue and Conclude There is a Right to Jury Trial Under the California Constitution in Juvenile Delinquency Proceedings; If So, Appellant's Prior Juvenile Adjudications Cannot Be Counted as Strikes Because He Was Denied This Right in the Underlying Juvenile Hearings.**

Nineteen years ago, this court filed an opinion concluding the California Constitution conferred a right to jury trial on alleged juvenile offenders when they were tried in juvenile adjudication proceedings.[9] We based this opinion on two independent and sufficient rationales.

First, we found the California Supreme Court's 1924 decision, *In re Daedler*,[10] had misread English law as it existed in 1850 and thus erroneously found it was permissible to deny California juveniles a right to jury trial when they were tried in juvenile court. As explained in our opinion, the constitutional right to jury trial for all Californians, adult or juvenile and in civil or criminal proceedings, is co-extensive with the right English citizens enjoyed when California became a state in 1850.[11] That issue, in turn, is a matter of historical fact.[12] The California Supreme Court in its 1924 *Daedler* opinion, held juvenile defendants in our state lacked a right to jury trial, based on its historical finding English chancery courts in 1850 had the power to declare juvenile delinquents wards of the court. There was no right to jury trial in these equitable proceedings in England, so there was no such right when California juvenile courts declared juvenile offenders here to be wards of the court.[13]

In our opinion, *In re Javier A.,* we made an-depth historical review of *English procedural law, as it existed in 1850.*[14] On the basis of that research, we concluded our Supreme Court had erred some 60 years earlier when it

[9] *In re Javier A.* (1984) 159 Cal.App.3d 913 [206 Cal.Rptr. 386].

[10] *In re Daedler, supra*, 194 Cal. 320.

[11] "In the leading case of *People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283 [231 P.2d 832], the court articulated that test to be whether the type of case at issue was identical to—or similar to—those categories of cases in which litigants enjoyed the right to jury trial under the English common law as of the time California became a state in 1850." (*In re Javier A., supra*, 159 Cal.App.3d at p. 930.)

[12] " 'It is the right to trial by jury as it existed at common law which is preserved; and *what that right is, is a purely historical question, a fact* which is to be ascertained like any other social, political or legal fact. *The right is the historical right enjoyed at the time it was guaranteed by the Constitution.*' " (*People v. One 1941 Chevrolet Coupe, supra*, 37 Cal.2d at p. 287, italics added.)

[13] *In re Daedler, supra*, 194 Cal. at page 324.

[14] *In re Javier A., supra*, 159 Cal.App.3d at pages 931–947.

held juvenile courts could try alleged juvenile offenders without juries. With the advantage of library resources undreamed of in 1924, we found the English wardship proceedings the Supreme Court relied on to support denial of jury trial to alleged juvenile offenders in fact were only available where the parent or other custodian of the child was delinquent, not when the child was delinquent.[15] In fact, in 1850 England, all juveniles accused of violating any criminal law which could result in a loss of liberty for longer than three months had an absolute right to jury trial.[16] Accordingly, under the California Constitution, we concluded the state Constitution guaranteed alleged juvenile offenders a right to jury trial in any and all juvenile proceedings in which they faced even the *possibility* of a loss of liberty longer than three months.[17]

*Second*, employing a different but independent and sufficient rationale, we ignored English legal history and found the underlying policy rationale the California Supreme Court used to justify its 1924 decision was no longer valid—because of intervening changes in the goals and performance of

---

[15] "We first examined all the pre-1850 English cases cited in any American decision as supporting the notion the inherent *parens patriae* jurisdiction of English equity justified a declaration of wardship based on the minor's commission of a felony without trial by jury. Our research only located five such cases. None of these decisions suggests English equity courts had power to shift custody from the parents to another individual or institution for any reason remotely resembling the minor's involvement in criminal activity. Indeed in none was the court's jurisdiction activated by any type of misbehavior on the part of the juvenile. To the contrary, in each case the focus was on the worthiness—and usually the misconduct—of the parent or potential nonparent guardian of the child." (*In re Javier A., supra*, 159 Cal.App.3d at p. 941 [fns. omitted].)

[16] "We are now in a position to summarize the status of the juvenile delinquent's right to jury trial in 1850 England. Youngsters charged with a limited class of minor criminal conduct could be deprived of liberty for a maximum of three months without a jury trial. But those charged with felonious conduct (and most lesser criminal acts) were entitled to trial by jury. Parliament had expressly refused to pass legislation permitting juveniles to be committed to reform schools for periods longer than three months without a jury trial. And where equity's *parens patriae* jurisdiction depended upon a minor's personal misbehavior, those courts could only declare the minor a ward of the court after a jury found he had committed a felony." (*In re Javier A., supra*, 159 Cal.App.3d at p. 948.)

[17] "As *One 1941 Chevrolet Coupe* made crystal clear, the classification and accompanying right to jury trial was fixed in mid-19th century England. To return to the language of *One 1941 Chevrolet Coupe*, '[The] Constitution does not permit the Legislature to confer on the courts the power of trying according to the course of chancery any question which has always been triable according to the course of the common law by a jury.' (37 Cal.2d at p. 299.) Whether equitable considerations indicated a youthful felon should be declared a ward of the court and placed in the custody of some benevolent organization or an individual other than his parents was a 'question [tried] according to the course of chancery' under the authority of the 1840 Infant Felons Act. But whether a given minor was a felon, that is, whether he indeed had committed a crime and for this reason was eligible to be declared a ward, that was a 'question which has always been triable according to the course of the common law by a jury.' It is this 'historical right' which is made 'inviolate' by article I, section 16 of the California Constitution. The Legislature cannot extinguish this right merely by shifting the determination of criminal conduct from law to equity." (*In re Javier A., supra*, 159 Cal.App.3d at p. 949.)

juvenile courts. As we explained, the 1924 Supreme Court opinion had reversed a prior decision of that Court issued 27 years earlier which had held juveniles could *not* be denied a jury trial when accused of violating the criminal law.[18] In reversing that earlier 1897 opinion, the Court emphasized juvenile courts—at that time a relatively recent innovation in the United States—had a very different goal and function from the criminal courts. In juvenile courts as they existed in 1924, the state was not a prosecutor seeking vengeance, but a "parens patria" seeking only the best interests of the straying child. Likewise, any disposition the court might impose on the juvenile offender, even a commitment to some sort of special juvenile facility, was not a "punishment" but only the corrective measure a loving parent might take to encourage better behavior in the future.[19]

For decades after *In re Daedler*, California's courts and its Legislature consistently reiterated juvenile offender proceedings were different from criminal proceedings. The goal was not to punish the child but to redirect him to the right path. In 1930, for instance, a California appellate court explained: " 'The main purpose of the [juvenile court] is to provide for the care and

---

[18] *Ex parte Becknell* (1897) 119 Cal. 496 [51 P. 692]. In that case, the earlier Supreme Court held, "The boy cannot be imprisoned as a criminal without a trial by jury. As an award of guardianship it is equally void, for his parents—his natural guardians—cannot be deprived of their right to his care, custody, society, and services except by a proceeding to which they are made parties, and in which it is shown that they are unfit or unwilling or unable to perform their parental duties." (*Id.* at. p. 498.)

[19] "In 1924, the California Supreme Court was able to distinguish juvenile courts from adult criminal proceedings in glowing terms which spoke of benevolent purposes and minimal consequences. As described by the *Daedler* court: 'The purpose of the statute is to save minors under the age of 17 years from prosecution and conviction on charges of misdemeanor and crimes and to relieve them from the consequent stigma attaching thereto; to guard and protect them against themselves and evil-minded persons surrounding them; to protect and train them physically, mentally, and morally. It seeks to benefit not only the child but the community also by surrounding the child with better and more elevating influences and training it in all that counts for good citizenship and usefulness as a member of society. ·Under it the state which through its appropriate organs is the guardian of the children within its borders ... assumes custody of the child, imposes wholesome restraint, and performs parental duties.... It is of the same nature as statutes which authorize compulsory education of children, the binding of them out during minority, the appointment of guardians and trustees to take charge of the property of those who are incapable of managing their own affairs, the confinement of the insane, and the· like.' (*In re Daedler, supra,* 194 Cal. at p. 329.)" "Quoting from the leading case of *Commonwealth* v. *Fisher* (1905) 213 Pa. 48 [62 A. 198], Ann. Cas. 92 [213 Pa. 48 [62 A. 198]] the California court continued by characterizing the procedural aspects of the juvenile court in 1924: 'There was *no trial for any crime here* and the *act is operative only when there is to be no trial.* The very purpose of the act is to prevent a trial, though if the welfare of the public require that the minor should be tried, power to try it is not taken away; but as already stated the act is not for the trial of a child accused of a crime but is mercifully to save him from such an ordeal with the prison or penitentiary in its wake, if the child's own good and the best interests of the state justify such salvation.' " (*In re Daedler, supra,* 194 Cal. at p. 330, italics added.)" (*In re Javier A., supra,* 159 Cal.App.3d at p. 957.)

custody of children who have shown ... criminal tendencies, in order to have them trained to good habits and correct principles.... [T]he judge [has] *more consideration for their future development than for their past shortcomings.*' "[20] Likewise, in 1947, another appellate court was emphasizing, "Proceedings of the juvenile court in dealing with incorrigible minors or those committing crime are *not of a criminal nature....* [The juvenile court system] is more in the character of a guardianship whereby the minor is relieved of the stigma of a criminal conviction by placing him upon probation with individuals or in institutions having the facilities to give him corrective care, supervision and training."[21] In 1952, another court made a similar distinction. "An order adjudging a person to be a ward of the juvenile court is *not a conviction of crime* and proceedings to have such a wardship declared are *not criminal proceedings.*"[22]

As recently as 1975, a California appellate court was still trumpeting the differences between the purposes and consequences of the criminal and juvenile delinquency systems. "Juvenile court action thus differs from adult criminal prosecutions where 'a major goal is corrective confinement of the defendant for the *protection of society.*'... The *protective goal of the juvenile proceeding is that 'the child* [shall] not become a criminal in later years, but a useful member of society.' "[23]

Meanwhile, in 1937, the Legislature erased any doubt about its insistence juvenile delinquency adjudications were not to be treated as criminal convictions. It enacted the predecessor of the present Welfare and Institutions Code section 203, guaranteeing juvenile offenders "[a]n order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime *for any purpose,* nor shall a proceeding in the juvenile court be deemed a criminal proceeding."[24] This was consistent with other provisions in the juvenile court act stating the purpose of these courts was to serve "the spiritual, emotional, mental and physical welfare of the minor" and "to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents."[25]

This sharp distinction between criminal and juvenile proceedings, their purposes and consequences, was not to survive the 20th century, however. When this court first examined the juvenile court process in our *In re Javier*

---

[20] *People v. Superior Court of San Bernardino County* (1930) 104 Cal.App. 276, 281 [285 P. 871].

[21] *In re Dargo* (1947) 81 Cal.App.2d 205, 207 [183 P.2d 282], italics added.

[22] *In re Magnuson* (1952) 110 Cal.App.2d 73, 74 [242 P.2d 362].

[23] *In re Ricardo M.* (1975) 52 Cal.App.3d 744, 749 [125 Cal.Rptr. 291], italics added.

[24] Welfare and Institutions Code section 203 (italics added).

[25] Statutes 1961, chapter 1616, section 2.

opinion, we already found an accelerating rate of convergence. In 1975, the same year an appellate court was drawing the distinction that the primary purpose of criminal courts was to protect the public, while the primary goal of juvenile courts was to protect the minor,[26] the Legislature formally altered the mission of juvenile courts. It amended the statement of purposes to embrace "*protection of the public* from the consequences of criminal activity," and charged juvenile judges with the responsibility of "tak[ing] into account such protection of the public in their determinations," e.g., their findings of "guilt" and dispositional decisions.[27]

As a result of these and other developments, by 1980 Division Two of this court was conceding the "widely held belief that under current practices juvenile court proceedings ... are in reality criminal proceedings and the claim that such proceedings are 'for the protection of the minor' is pure fiction' " while possibly not true in 1966, "is certainly true today."[28] Then in 1982 Proposition 8 became the law of the state, threatening to place juvenile adjudications and criminal convictions on the same plane, allowing both to be used for purposes of impeachment or sentence enhancement.[29] Thus, by 1984, the California Supreme Court itself was compelled to admit the accuracy of Division Two's characterization the distinction between criminal and juvenile proceedings was "pure fiction."[30]

Based on our review of English legal history in the 19th century and of the historical evolution of California's juvenile process—its purposes, procedures, and consequences—during the 20th century, this court was left with only one choice. As of 1984, there was no justification for denying alleged juvenile offenders a right to trial by jury in juvenile court.

Yet because our division was differing from prior opinions of the California Supreme Court on the right to jury trial issue, the majority felt bound by the higher court's earlier decision. So we affirmed the defendant's adjudication and lengthy commitment, but with a strong plea to the then California

---

[26] *In re Ricardo M., supra,* 52 Cal.App.3d at page 749.

[27] See Statutes 1975, chapter 819, section 1, appearing as Welfare and Institutions Code section 202, subdivision (b) (italics added). In 1977, the Legislature also added the "protection of the public" purpose to the initial list of juvenile court goals. (Stats. 1977, ch. 910, § 1, now found in Welf. & Inst. Code, § 202, subd. (a).)

[28] *In re Gregory K.* (1980) 106 Cal.App.3d 164, 168, footnote 2 [165 Cal.Rptr. 35].

[29] "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence ...." (Cal. Const., art. I, § 28, subd. (f).)

[30] *In re Jerald C.* (1984) 36 Cal.3d 1, 9, footnote 4 [201 Cal.Rptr. 342, 678 P.2d 917].

Supreme Court asking it to reconsider what we believed to be an erroneous 1924 decision by that court.[31]

Significantly, the dissent from this reluctant affirmance came from a pro tem justice, Judge Carol Fieldhouse, who had spent several years as a juvenile court judge and who returned to that assignment when his pro tem tour concluded. Judge Fieldhouse dissented on grounds this court should have reversed, despite the 1924 California Supreme Court case of *In re Daedler*. In his view and based on his own experience within that system, the juvenile court process had changed dramatically since 1924. The rationale of *Daedler* simply no longer squared with reality. Already, by 1984, the goals were too punitive, the process too adversarial, and the consequences too much like punishment to qualify as anything other than criminal.[32]

The California Supreme Court denied review (over two dissenting justices) in the case of *In re Javier A.*[33] I am not at all sure that court would have declined to hear this case had the justices foreseen the possibility of a "three strikes" law and the notion a juvenile offender who was denied the right to jury trial and found "guilty" by a juvenile court judge could, as a result, end up many years hence with a sentence of 25 years to life (or worse) for something as inconsequential as a petty theft, possession of a minuscule amount of drugs, or a similar relatively minor crime. But I have no intention of lingering on that lost opportunity. My concern is with the present and the constitutional consequences of allowing trial courts to use juvenile court adjudications as prior "strikes" when imposing "two strike" and "three strike" and even "multi-strike" sentences on former juvenile but now adult defendants.

The answer would be simple, of course, had the California Supreme Court granted review of *In re Javier A.* in 1984 and already found there was a right to jury trial in juvenile offender cases involving possible commitment beyond three months. Had our state's high court done so at that time, any juvenile

---

[31] "Nonetheless, this court places high value on stare decisis and particularly *Auto Equity's* mandate that lower courts defer to the Supreme Court the question of whether and when prior Supreme Court decisions should be overruled.... Accordingly we conclude we are bound to follow *In re Daedler* unless and until it is overruled by the Supreme Court itself. And we must follow it no matter how erroneous we may feel it to be, indeed no matter how wrong it in fact may turn out to be. We can only urge the Supreme Court in the strongest possible terms to grant a petition for hearing in this case and to reconsider *In re Daedler* and its finding of 'historical fact.' " (*In re Javier A., supra,* 159 Cal.App.3d at p. 956.)

[32] "Contemporary juvenile law is in no way comparable to the system addressed by the *Daedler* court.... [¶] I agree wholeheartedly with my (step)-brothers in the majority opinion with respect to their reasoning. But I would reverse the judgment and remand for a new trial where appellant was afforded his constitutional right to trial by jury." (*In re Javier A., supra,* 159 Cal.App.3d at p. 975.)

[33] Review denied November 21, 1984 (Bird, C. J. and Reynoso, J. voting to grant).

adjudication for any offense obtained without a waiver of the right to jury trial would be unavailable as a "strike" when it came to sentencing in the adult court for whatever crime made the defendant eligible for second or third strike sentencing. Denied of such a fundamental constitutional right, the defendant's prior juvenile delinquency adjudication would be invalid and could not be used as a "strike" when calculating his sentence in the present case.[34]

In my view, it is now time for the California Supreme Court to revisit this issue. There is even more reason for our high court to do so in 2003 than there was in 1984. The intervening two decades have only piled on more and more onerous consequences when a juvenile is adjudicated to be a "delinquent." While the *Daedler* court emphasized juveniles were not punished as a result of being found to have committed criminal offenses the Legislature changed the law in 1985 to expressly authorize them to receive "punishment."[35] Similarly, Welfare and Institutions code section 203 may still purport to provide "[a]n order adjudging a minor to be a ward of the juvenile court shall *not be deemed a conviction* of a crime *for any purpose*."[36] Yet in 1993 this prohibition was overruled by the three strikes law which expressly provides such an order *is* a "felony conviction" for the most critical possible purpose—sentence enhancement under that law. As the relevant section reads: "A prior juvenile adjudication *shall constitute* a prior *felony conviction* for purposes of sentence enhancement [under the three strikes law] ...."[37] Now scores if not hundreds of criminal defendants receive life sentences every year based on strikes they "earned" as young teenagers in proceedings where they lacked the fundamental constitutional right to trial by jury.

It took almost 70 years. But the metamorphosis of juvenile court adjudications from equitable declarations of wardship in 1924 to "felony convictions" in the current day was completed when the three strikes law became effective in 1993. As explained above, over the years these adjudications already had drifted in that direction. Years before 1993 juveniles could be deprived of their freedom in order to "protect the public," even where this was not the best course toward rehabilitation. Not long after that, juvenile judges were instructed they could and presumably should impose incarceration as "punishment." But it is difficult to overestimate the escalation represented by the reclassification of juvenile delinquency adjudications as "felony convictions" for purposes of the "three strikes" law.

---

[34] When litigants are denied a jury trial in violation of the California Constitution, the judgment is erased and they are entitled to a retrial before a jury. (See cases collected in 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 23, p. 477.)

[35] Welfare & Institutions Code section 202.

[36] Welfare & Institutions Code section 203.

[37] Penal Code section 667, subdivision (d)(3).

For any juveniles accused of "strike eligible" offenses in juvenile court the most significant consequence they face from a "true finding" is the addition of a "strike" to their record. Even if the juvenile adjudication results in a commitment to a juvenile facility for a substantial period of time that loss of liberty is dwarfed by the possibility of being sent to prison for the rest of one's life, often for a trivial future offense, because of a "strike" or "strikes" one acquired in those juvenile proceedings.

Indeed in my view, the California Supreme Court has to wear blindfolds to avoid revisiting the issue of whether the juvenile process and its consequences have changed so much since 1924 (and especially since 1984) they now require the accused possess a right to demand jury trial. At a minimum, our high court should reconsider this question when the offense alleged may entail a significant loss of freedom or especially when it would count as a "strike" for purposes of future sentencing as an adult. The possibility a youthful offender can be denied an opportunity for a jury trial in a juvenile court proceeding that can put him one-third of the way to a life sentence does not square with fundamental notions of due process. Appellant's situation is even more dramatic, of course. Here two juvenile adjudications arising from a single criminal act put him two-thirds of the way toward the life sentence he received.

Much of the discussion and many of the cases upholding the denial of jury trial in juvenile court proceedings are based on what appears to be a false dichotomy. If a juvenile court system allows jury trials, it is assumed, the system cannot and will not retain whatever rehabilitative and parental characteristics it may possess in the absence of such a right. And yet these are completely unrelated phenomena—how a juvenile court decides whether the accused committed the crime of which he or she is charged need have no bearing whatsoever on how it deals with that same juvenile once the judge, or a jury, returns a "true finding." In 13 jurisdictions, including large states such as Texas and Michigan, accused delinquents have long enjoyed a right to jury trial in juvenile court.[38] Nothing suggests those juveniles are treated any worse than those in California or other states that deny juveniles this right.[39] Nor is there anything demonstrating any deleterious change occurred in the treatment of juvenile offenders in Alaska after 1971, the year the Supreme Court of that state ruled it was unconstitutional to continue denying alleged juvenile offenders the right to jury trial in juvenile court.[40]

---

[38] These states and the statutes conferring a right to jury trial in juvenile delinquency proceedings in each are listed in *In re Javier A., supra,* 159 Cal.App.3d at page 970, footnote 54.

[39] See *In re Javier A., supra,* 159 Cal.App.3d at pages 971–972, and studies cited therein.

[40] *RLR v. State* (Alaska 1971) 487 P.2d 27.

It simply has not been demonstrated the declaration of a constitutional right to jury trial in juvenile delinquency proceedings must or will eliminate the remaining rehabilitative and parental features of the juvenile court system. Nor, conversely does the existence of any such features furnish a reason for continuing to deny juveniles their constitutional right to trial by jury during the "guilt-finding" phase of the juvenile court process.

The majority opinion quotes a passage from a California Supreme Court dissent summarizing the remaining differences between the consequences attending a juvenile declaration of wardship and those following an adult criminal conviction in California. (Maj. opn., *ante*, at p. 1080.) One might question the significance of some of these differences—such as an effective eight- or nine-year "cap" on the loss of freedom a juvenile court can impose on a 17- or 16-year-old[41] when the maximum effective incarceration an adult would suffer for most crimes, including many "strike eligible" felonies, is at or less than that "cap."[42] (As to those offenses carrying a higher adult sentence, one could anticipate the prosecutor would likely bring the case in adult court and thus avoid the juvenile "cap.") One also might question whether these remaining differences between juvenile adjudications and criminal convictions are not dwarfed by the consequences that are now similar—and especially the provision converting many "juvenile adjudications" of 16- and 17-year-olds into "felony convictions."

Nonetheless, it is encouraging to see some differences remain. But as explained above, those differences do not justify the denial of a right to jury trial in such cases when they are heard in juvenile court. Nor would the enforcement of a constitutional right to jury trial in juvenile court mean those differences would disappear. It is simply a false dichotomy, not consistent with the experience in states which give their alleged juvenile delinquents a right to trial by jury in juvenile proceedings. Consequently, the existence of these differences in treatment should not be employed as an excuse for denying alleged juvenile offenders their "inviolate" right to trial by jury in California's juvenile courts.

Should our Supreme Court revisit the issue, for all the reasons discussed above, in my view it will prove difficult to avoid the conclusion juveniles alleged to have committed "strike eligible" offenses are entitled to demand trial by jury under the California Constitution. Likewise, as to those juveniles,

---

[41] This "cap" is the result of the statute providing juvenile courts cannot incarcerate offenders beyond the age of 25. (Welf. & Inst. Code, §§ 1769, 1771.)

[42] The "high term" for robbery, carjacking and assault with a firearm, for instance, is nine years. (Pen. Code, §§ 213, subd. (a)(1)(A), 215, subd. (b), 245, subd. (b).) The "high term" for residential burglary is six years (Pen. Code, § 461), and for battery with serious bodily injury it is four years (Pen. Code, § 243, subd. (d)).

such as appellant, previously adjudicated to have committed such offenses without affording them a right to jury trial, it will prove difficult to escape the conclusion those adjudications are invalid and unavailable as "prior strikes" when calculating their sentences under the three strikes law.

### C. Juveniles Can Be Denied A Right to Jury Trial Only Because Juvenile Courts Are Courts of Equity Rather Than Criminal Courts and Their Adjudications Are Equitable Declarations of Wardship Not Criminal Convictions; As Such, These Adjudications Cannot Be Reclassified As "Felony Convictions" and Counted as "Strikes" in the Three Strikes Sentencing Scheme.

Assuming a juvenile court can adjudicate a juvenile accused to have committed a criminal offense without affording that accused a right to jury trial the question remains whether that adjudication can be counted constitutionally as a "strike" for purposes of the "Three Strikes" law. Just because the adjudication itself is valid, despite denial of a jury trial, does not mean the California Constitution permits its use as a "strike."

As explained earlier, the constitutionality of denying juveniles a right to jury trial is predicated on classifying juvenile delinquency proceedings as something other than "criminal proceedings." Indeed if classified as "criminal proceedings" the accused of necessity would enjoy an indisputable right to jury trial under both the federal and California constitutions.[43] Instead, as established by statute, juvenile courts are courts of equity wielding equitable powers and limited to dispensing equitable remedies.[44] They are empowered to declare juveniles to be "wards of the court" based either on the absence of proper parents ("dependency" jurisdiction)[45] or the juvenile's own misbehavior ("delinquency" jurisdiction).[46] Once having declared these juveniles to be wards of the court, the judge can place them with substitute parents or in institutions, designed, theoretically at least, to give them proper care and guidance.

Because, and only because, there was no right to trial by jury in English courts of equity as of 1850, and only because our juvenile courts are courts of equity rather than criminal courts, do juveniles lack a constitutional right to jury trial in these courts in 21st-century California. It may be "pure fiction,"

---

[43] *Duncan v. Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444]; *Bloom v. Illinois* (1968) 391 U.S. 194 [20 L.Ed.2d 522, 88 S.Ct. 1477].

[44] Welfare and Institutions Code section 203.

[45] Welfare and Institutions Code section 300 et seq.

[46] Welfare and Institutions Code section 600 et seq.

as pointed out in the prior section, [47] to continue treating California's juvenile courts as if they were courts of equity and their adjudications as equitable judgments declaring juveniles accused to be merely "wards of the court." But unless we indulge that fiction, if we instead admit what is happening in juvenile court is now the equivalent of criminal proceedings and the resulting outcomes the equivalent of criminal convictions, we can no longer constitutionally deny juveniles a right to jury trial in delinquency proceedings before the juvenile court. On the other hand, if we continue to indulge the fiction, and do so honestly, we cannot treat a mere "declaration of wardship" as a "felony conviction" for purposes of imposing "two strike" and "three strike" sentences. In doing so, we retroactively convert the limited equitable remedy this court of equity was empowered to deploy without a jury trial into the much harsher and qualitatively different judgment only a full blown felony trial court can produce and then only after allowing the accused a right to trial by jury.

For another way of viewing the constitutional dilemma, return to the juvenile court at the time the judge has found the accused committed a "strike eligible" offense. When the court then declares this juvenile a "ward of the court" it is simultaneously finding him guilty of a "felony conviction" for purposes of the three strikes law. In many instances, the latter will prove to be far more important to the juvenile than the former: it can condemn him to a lifetime in prison, with a minimum 20 years or more behind bars. The "felony conviction" consequence may appear in the Penal Code, many volumes removed from the Welfare and Institutions Code where the juvenile court law is found. But it is still part of the body of California law defining what the juvenile court is deciding and what consequences it is imposing on the juvenile accused. For all practical purposes, it is as if the juvenile court law itself provided the juvenile court could declare a juvenile delinquent it found had committed a "strike-eligible" offense to be a "ward of the court" and also a "convicted felon" for purposes of future sentencing under the three strikes law.

The "felony conviction" consequence California's three strikes law added to a juvenile court's declaration of wardship is far beyond what an English court of equity could have ordered in 1850. Consequently, consistent with California's Constitution, it is a consequence which cannot be levied unless and until juvenile courts allow accused juveniles their inviolate constitutional right to trial by jury. In the meantime the only way to avoid this constitutional infirmity is to disallow usage of juvenile adjudications as "strikes" in the three-strikes sentencing scheme.

---

[47] See page 1085, *ante.*

### D.   Recent Changes in California Law Unconstitutionally Allow Prosecutors to Unilaterally Decide When and Whether Older Juveniles Charged With "Strike Eligible" Offenses Shall Be Tried By a Juvenile Judge or By a Jury.

Finally, as the majority opinion itself observes, Proposition 21 introduced recent changes in the law allowing prosecutors the choice of filing potential "strike-eligible" cases against juveniles 16 or older in adult court rather than filing them in juvenile court.[48] (Maj. opn., *ante*, at p. 1081.) As a result, under current law, the prosecutor has the option of choosing whether the juvenile accused will have a right to demand trial by jury or instead be denied that right and tried before a juvenile court judge. This allows a prosecutor, an integral part of the government, to defeat one of the main historical purposes of the right to jury trial—to allow litigants to avoid having their cases decided by government officials who in a given case or type of case may be suspect on grounds of incompetence, bias, cronyism, or even corruption.[49]

It is true this recent grant of discretion allows a prosecutor to channel an accused delinquent into the juvenile court rather an adult criminal court for all the right reasons—the particular juvenile is not very dangerous, or is a promising candidate for rehabilitation, and like considerations. But it also gives the prosecutor discretion to deny an accused juvenile the opportunity for a jury trial for all the wrong reasons—the prosecution's case is weak, or this particular juvenile would be especially sympathetic to a jury, or for some other reason the jury would be more likely to acquit than a judge. Or it is even possible to imagine a prosecutor choosing a juvenile court trial without jury in order to gain the advantage of trial before a judicial officer or group of judicial officers known to render decisions favorable to the prosecution—in other words, the very sort of judge the right to jury trial is designed to allow an accused to avoid. Moreover, whichever route the prosecutor elects, if successful, the conviction or juvenile adjudication inflicts a "strike" on the accused—ordinarily by far the most significant consequence attaching to a finding of guilt.

---

[48] Welfare and Institutions Code section 707, subdivision (d). In *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548–573 [117 Cal.Rptr.2d 168, 41 P.3d 3], the California Supreme Court upheld this provision against a very different set of constitutional claims objecting to a prosecutor's decision to file against a juvenile accused in the adult criminal court. This obviously is a forum where the accused enjoyed the federal and state constitutional right to trial by jury and the prosecutor's election in that case raised none of the constitutional concerns discussed in this section of the dissent.

[49] See, e.g., *Duncan v. Louisiana, supra,* 391 U.S. 145, 156 [20 L.Ed.2d 491, 88 S.Ct. 1444].

Ironically, at the same time California law gives the prosecutor the option of trying an accused juvenile to a judge or to a jury, it denies the juvenile that same choice. In *Joey W. v. Superior Court*, a juvenile willingly offered to surrender the "benefits" offered by the juvenile court in order to enjoy a right to jury trial in the adult court. A juvenile court denied him that option and the appellate court affirmed.[50]

In my view, the law conferring this enormous power on California prosecutors also provides an additional independent and sufficient ground for finding California's juvenile court scheme as presently constructed is unconstitutional. What the U.S. Supreme Court said about the reasons behind the right to jury trial underlie the California Constitution's jury trial guarantee as well. In large measure the right to jury trial, especially in criminal cases, exists to protect citizens accused of crime from the "corrupt or overzealous prosecutor" and the "compliant, biased, or eccentric judge."[51] Yet this new provision puts one government official, a prosecutor, in absolute control of whether a juvenile accused will be tried by another government official, a judge, or by a jury of fellow citizens. Thereby, the juvenile accused faces the possibility of a "corrupt or overzealous" prosecutor, for his or her own reasons, forcing the accused to trial before a "compliant, biased, or eccentric" judge. This compounds the effect of denying the juvenile accused his own choice between judge and jury. In my view, it also pounds another nail in the constitutional coffin encasing the claim our juvenile courts can properly deny jury trials to this class of alleged juvenile offenders.

## II. THE UNITED STATES CONSTITUTION BARS USE OF A JUVENILE ADJUDICATION OBTAINED IN A PROCEEDING WHERE THE DEFENDANT LACKED THE RIGHT TO JURY TRIAL TO ENHANCE A SENTENCE BEYOND THE MAXIMUM PERMITTED FOR THE CURRENT CRIME.

In 1971, the U.S. Supreme Court interpreted the U.S. Constitution to allow states to deny juveniles a right to jury trial in juvenile proceedings.[52] Now nearly a third of a century later it is not altogether clear the rationale of that opinion, *McKeiver v. Pennsylvania*, remains sound given the inexorable

---

[50] *Joey W. v. Superior Court* (1992) 7 Cal.App.4th 1167, 1175 [9 Cal.Rptr.2d 486]. The court held "the juvenile court was not required to grant Joey's motion [to be determined unfit to be tried as a juvenile] based simply on his having attained his majority and his having knowingly, intelligently, and advisedly waived his right to the benefits of juvenile process."

[51] Both of the clauses quoted in this sentence are found in *Duncan v. Louisiana, supra*, 391 U.S. 145, 156, the Supreme Court decision holding the 6th Amendment guarantee of right to jury trial applied to state criminal prosecutions through the 14th Amendment.

[52] *McKeiver v. Pennsylvania* (1971) 403 U.S. 528 [29 L.Ed.2d 647, 91 S.Ct. 1976] (*McKeiver*).

convergence of the criminal and juvenile systems since it was issued.[53] Furthermore, even if juvenile courts can deny jury trial rights to alleged delinquents, this does not mean the Constitution allows adult criminal courts to use adjudications these juvenile courts produce as "strikes" to enhance later adult sentences.

---

[53] The time may have arrived for the U.S. Supreme Court to revisit the fundamental issue it addressed in *McKeiver v. Pennsylvania* some 32 years ago. Even the plurality opinion signed by three justices and joined in part by another suggested there was a limit on the degree to which states could criminalize their juvenile delinquency proceedings. Cross that line, the high court implied, and the U.S. Constitution would require the accused juvenile to enjoy a right to trial by a jury. As the court held: "Perhaps that ultimate disillusionment [with the juvenile court process] will come one day, but *for the moment* we are disinclined to give impetus to it." (*McKeiver, supra,* 403 U.S. at p. 551, italics added.)

The question is whether, during the 32 years since *McKeiver* was decided, California's juvenile court system has evolved so much in the direction the *McKeiver* plurality worried about that the U.S. Constitution mandates a right to jury trial in such proceedings. For reasons described in more detail elsewhere in this dissent, I am convinced the answer to that question is yes. Since 1971, the California juvenile court law has been transformed by the Legislature and various propositions. Its purposes have become nearly identical to the criminal justice system. Punishment has been officially recognized as an appropriate function, just as it is for the criminal system. And the long-term consequences of a juvenile adjudication, at least in an instance of violent or serious offenses, are as severe as a criminal conviction for the same crime.

In a recent Harvard Law Review article it was suggested the U.S. Supreme Court indeed should revisit and probably overrule *McKeiver v. Pennsylvania.* "Whether or not there was a great practical distinction—beyond the procedural protections [right to jury trial] at issue—between the criminal and juvenile justice systems of 1971, the systems have since converged to the point that *McKeiver*'s idealistic conception of the juvenile justice system is hard to sustain. ... One juvenile justice scholar summarizes: 'Within the past three decades, judicial decisions, legislative amendments, and administrative changes have transformed the juvenile court from a nominally rehabilitative social welfare agency into a scaled-down, second-class criminal court for young offenders that provides neither therapy nor justice.' The increasing convergence of the juvenile and criminal courts undermines one of *McKeiver*'s key reasons for denying juries to juveniles—preservation of the unique aspects of the juvenile system—as the system loses the unique aspects the Court wanted to preserve. [¶] ... Both the Supreme Court's recent jury trial jurisprudence and its findings in *Ballew[v. Georgia* (1971) 435 U.S. 223 [55 L.Ed 234, 98 S.Ct. 1029]] concerning the relative reliability of larger factfinding bodies ... combined with the increasing convergence of the adult and juvenile justice systems, suggests that *McKeiver*'s denial of the jury trial right to juvenile court defendants is ripe for reconsideration. [Fns. omitted.]" (Note, *Recent Cases: Constitutional Law—Right to Jury Trial—Eighth Circuit Holds an Adjudication of Juvenile Delinquency To Be a 'Prior Conviction' for the Purpose of Sentence Enhancement at a Subsequent Criminal Proceeding.—United States v. Smalley, 294 F.3d 1030 (8th Cir. 2002)* (2002) 116 Harv. L.Rev. 705, 711–712 (hereafter Note), quoting from Feld, *The Transformation of the Juvenile Court—Part II: Race and the "Crack Down" on Youth Crime* (1999) 84 Minn. L.Rev. 327, 328. What the Harvard Law Review observes about the convergence of juvenile and criminal proceedings in the nation as a whole is, if anything, even truer and more pronounced in California. Thus, if the United States Supreme Court wants to put the continued validity of its *McKeiver* rationale to a true test it should use a California case as the vehicle.

In the landmark case of *Apprendi v. New Jersey*,[54] the Supreme Court held a jury, not a judge, must decide all facts the judge uses to sentence a defendant to a lengthier term than that provided for the offense of which the jury hearing the case found the defendant guilty. The Court allows an exception for "prior convictions." But even this is not a true exception, because the facts behind those prior criminal convictions also were decided by a jury—or could have been if the defendant so chose. True, it is not the same jury as decided the defendant guilty of the current offense. Yet it is a jury, nonetheless, making the factual determination the defendant committed the earlier criminal acts warranting an escalation of the penalty beyond the maximum for the current offense. Thus, the "prior conviction" exception preserves the fundamental constitutional goal of protecting defendants' right to a jury trial as to all facts relevant to his loss of liberty.

But what of prior juvenile adjudications in states, like California, which deny accused delinquents any opportunity for a trial by jury? May courts still use those juvenile adjudications as "prior convictions" warranting enhanced sentences despite the fact *no* jury decided whether the defendant committed the prior offense? Or does this practice violate *Apprendi* and the rationale underlying its holding? At this point there is a split of authority on this issue in the federal courts. In my view, however, the better reasoned view is the one adopted by the Ninth Circuit in *United States v. Tighe*.[55]

In *Tighe*, the court held a trial court can only use a prior conviction to enhance a defendant's current sentence if the defendant had the right to trial by jury in the proceeding where he was found guilty of that earlier offense. The *Tighe* court went on to hold prior juvenile court adjudications are unavailable to enhance adult sentences for the reason defendants were not afforded a right to jury trial in those juvenile proceedings.[56] As a consequence, it reversed a sentence under a federal statute, the Armed Career Criminal Act.[57] This statute mandates a minimum 15-year sentence for defendants who have three previous convictions for violent or serious drug convictions and are later found guilty of possessing a firearm. The Ninth Circuit reversed the sentence because one of the defendant's three priors was a juvenile delinquency adjudication in which the defendant had no right to trial by jury.[58]

The *Tighe* court based its decision on the Supreme Court's *Apprendi* case and related opinions.

---

[54] *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].

[55] *United States v. Tighe* (2001) 266 F.3d 1187.

[56] *United States v. Tighe, supra*, 266 F.3d at pages 1193–1195.

[57] 18 United States Code section 924(e).

[58] *United States v. Tighe, supra*, 266 F.3d at page 1198.

"[O]ther than the fact of a prior conviction, *any fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be *submitted to a jury*, and proved beyond a reasonable doubt."[59]

"Thus, the Supreme Court has held that prior convictions are exempt from *Apprendi's* general rule and, as sentencing factors, need not be afforded the same procedural protections that attach to facts that are construed as elements of the charged crime. [¶] At first blush, it may appear that Tighe's 1988 juvenile adjudication, which Congress has characterized as a "prior conviction" for the purposes of ACCA, falls precisely within *Apprendi's* exception for 'the fact of a prior conviction,' thus foreclosing Tighe's argument that the use of that adjudication at sentencing to increase his maximum penalty violated *Apprendi*. Such an analysis, however, ignores the significant constitutional differences between adult convictions and juvenile adjudications.

"[I]n *Jones v. United States*[60] ... [t]he Court explained why the fact of prior convictions was constitutionally distinct from other sentence-enhancing facts, '[U]nlike virtually any other consideration used to enlarge the possible penalty for an offense ... a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt and *jury trial* guarantees.'[61] Thus, *Jones'* recognition of prior convictions as a constitutionally permissible sentencing factor was rooted in the concept that prior convictions have been, by their very nature, subject to the fundamental triumvirate of procedural protections intended to guarantee the reliability of criminal convictions: fair notice, reasonable doubt and the right to a jury trial.

"One year later, in *Apprendi*, the court further elaborated on the importance of such procedural protections being inherent in prior convictions used as sentencing factors to increase statutory penalties. The Court explained that 'the certainty that procedural safeguards attached to the 'fact' of prior conviction' was crucial to *Almendarez-Torres' [v. U.S.* (1998) 523 U.S. 224 [140 L.Ed.2d 350, 118 S.Ct. 1219]] constitutional holding regarding prior convictions as sentencing factors. (Citation omitted.) The Court identified the right to a jury trial as one of the requisite procedural safeguards to which it referred: 'There is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.' (Citations omitted.) The Court's continued acceptance of [the prior conviction exception], then, was premised on sentence-enhancing prior convictions being the product of

---

[59] *United States v. Tighe, supra*, 266 F.3d at page 1192.

[60] *Jones v. United States* (1999) 526 U.S. 227 [143 L.Ed.2d 311, 119 S.Ct. 1215].

[61] Citing *Jones v. United States, supra*, 526 U.S. at page 249 (italics added).

proceedings that afford crucial procedural protections—particularly the right to a jury trial and proof beyond a reasonable doubt."[62]

"Therefore, the district court violated *Apprendi* when, at sentencing, it increased Tighe's penalty beyond the prescribed statutory maximum based on an adjudication *which denied Tighe the right to a jury trial*."[63] (Italics added.)

In my view, the *Tighe* rationale is correct and, moreover, applies to the use of juvenile adjudications as strikes in California's three strikes scheme just as it did to the use of prior serious or violent felonies to enhance sentences under the federal Armed Career Felons Act. In both instances, the trial court is using a juvenile adjudication as a prior conviction to enhance the defendant's sentence for his present crime beyond the statutory maximum punishment for that crime. And, in both instances, the defendant was found to have committed that prior offense in a juvenile court proceeding where he was denied the right to trial by jury. Thus, in the instant case as in *Tighe*, the underlying facts—whether the defendant actually committed the offense charged in the juvenile court proceeding—are being decided by a judge rather than a jury because the defendant was denied the option of jury trial. As the *Tighe* court held, under the rationale of United States Supreme Court opinions in *Apprendi* and *Jones*, this represents an unconstitutional denial of the constitutional right to trial by jury.

I find unpersuasive the Eighth Circuit's apparent attempt in *United States v. Smalley*[64] to shift the emphasis of the *Apprendi* and *Jones* opinions away from the right to jury trial, implying a judge-made decision would be sufficient if decided under a reasonable doubt standard.[65] Indeed if one of these procedural "stars" is higher in the "constellation" of constitutional guarantees than the other, it pretty clearly is the right to trial by jury, not proof beyond a reasonable doubt. In our 1984 opinion, *In re Javier A.*, we had occasion to quote from Thomas Jefferson's first inaugural address when he extolled the fundamental nature of the right to trial by jury in the American system. "Equal and exact justice to all men, of whatever state or persuasion ... and *trial by juries* impartially selected. These principles form the bright constellation which has gone before us and guided our steps ....

---

[62] *United States v. Tighe, supra,* 266 F.3d at pages 1193–1194.

[63] *United States v. Tighe, supra,* 266 F.3d at page 1195.

[64] *United States v. Smalley* (2002) 294 F.3d 1030.

[65] "We think that while the [Supreme] Court established what constitutes sufficient procedural safeguards (a right to jury trial and proof beyond a reasonable doubt), and what does not (judge-made findings under a lesser standard of proof), the Court did not take a position on possibilities that lie in between these two poles." (*United States v. Smalley, supra,* 294 F.3d at p. 1032.)

[S]hould we wander from them in moments of error ... let us hasten to retrace our steps and to regain the road...."[66]

In any event, the *Tighe* court did not consider these two rights were in competition. Rather, along with the right to notice they form an essential "triumvirate," all three of which must be present before it can be said a prior adjudication by a court qualifies as a "prior conviction" the defendant committed an earlier offense thus justifying an enhanced sentence for the current crime. That a defendant enjoyed one of those rights—or even two of them—is simply irrelevant to the question whether a trial court can utilize the prior adjudication as a reason to elevate the defendant's sentence beyond the statutory maximum for the present crime. In my view, the *Tighe* court has the better of it on this score, as well.

The *Smalley* court further denigrates the importance of the constitutional right to trial by jury when it suggests the *Jones/Apprendi* exception for "prior convictions" turns on "whether juvenile adjudications, like adult convictions, are so reliable that due process of law is not offended by such an exemption."[67] This argument appears to assume a conviction can be "reliable" even though the defendant is denied the option of a jury trial. This appears to challenge the entire Anglo-American legal edifice which is constructed on the foundation of a citizen's right to trial by a jury of his or her own fellow citizens. In the words of England's legendary legal philosopher, William Blackstone:

"[Trial] by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases! ... [It] is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by unanimous consent of twelve of his neighbors.... A [right] that I may venture to affirm has, under Providence, secured the just liberties of this nation for a long succession of ages....

"It is, therefore, upon the whole, a duty which every man owes to his country, his friends, his posterity and himself, ... to guard with the most jealous circumspection against the introduction of new and arbitrary methods of trial, which, under a variety of plausible pretences, may in time imperceptibly undermine this best preservative of English liberty."[68]

---

[66] Jefferson, First Inaugural Address (Mar. 4, 1801).

[67] *United States v. Smalley, supra*, 294 F.3d at page 1033.

[68] 3 Blackstone, Commentaries on the Laws of England (1780) at pages 379, 381.

To the *Smalley* court the "plausible pretence" evidently is the perceived need to use non-jury juvenile adjudications as if they were criminal convictions in order to compound the punishments inflicted on adult criminals. And, the "arbitrary method of trial" deemed an appropriate substitute for trial by jury is a judge-made finding predicated on a reasonable doubt standard of proof. Isn't this the very sort of incremental undermining of the "glory" of Anglo-American jurisprudence, the right to trial by jury, Blackstone warned use to resist?

Blackstone may have offered the most eloquent defense of the right to jury trial, but the United States Supreme Court has explained the practical reasons for the right. These reasons reach far beyond the timid form of due process test the *Smalley* court employs to satisfy the *Jones-Apprendi* exception. In one of many opinions emphasizing the critical importance of the right to jury trial, especially in criminal cases, our nation's high court explained, "The right to jury trial in the Sixth Amendment was incorporated within the concept of due process and hence applicable to the states in serious cases because a jury was deemed to give the defendant 'an *inestimable safeguard* ... against the compliant, biased, or eccentric judge.' "[69]

In the juvenile context, the real danger in fact may come not as much from "compliant, biased, or eccentric judges", as from the "kindly, fatherly or motherly judge" who sees a youngster mired in a horrendous environment and wants to rescue the juvenile before it is too late. The temptation, often irresistible, is to remove the child from those terrible circumstances even though that may require bending the reasonable doubt standard in order to find him or her guilty of the charged offense.

Thus, even assuming juvenile judges deciding an offender's guilt without a jury ordinarily produce a "reliable" adjudication does not mean this satisfies the due process right to the "inestimable safeguard" of a right to trial by jury. In other words, "reliability" may be necessary, but it certainly is not sufficient under the U.S. Constitution.

True, adult criminal defendants frequently waive their right to jury trial and submit to trial by judge. But merely because those defendants and the courts regard these judge-made decisions as "reliable" and constitutional, does not mean judge-made decisions are constitutional or even equally "reliable" when the defendant lacks the option to demand a jury. The right to demand a jury rather than a judge try one's case both allows the defendant to avoid the "compliant, biased, or eccentric (or maybe the "too kindly" juvenile court) judge," but also constrains any judge the defendant agrees to hear the case

---

[69] *Duncan v. Louisiana, supra,* 391 U.S. at page 156.

without a jury. For, if that judge wants future jury waivers from other defendants, he or she must avoid a reputation for unjust or irrational anti-defendant results—or even "kindly" adverse adjudications of innocent juveniles. Thus, even if one deems "reliability" the only and ultimate measure of the constitutionality of what passes for "prior convictions" under *Jones* and *Apprendi*, the absence of a right to jury trial renders juvenile adjudications so unreliable as to be constitutionally infirm.

Other factors also bring the "reliability" of such decisions into question. A recent Harvard Law Review article marshals empirical evidence and even recent Supreme Court authority suggesting juries are more reliable fact finders. The article reports, "recent studies suggest that judges are more likely than juries to develop cognitive biases favoring police at the expense of defendants, that the unique dynamic present in the give-and-take format of jury deliberations enhances reliability, and that the diverse range of experiences represented by a twelve-person jury increases the fairness of its evaluations as compared to those of a single judge. Relying on such social science research, the Supreme Court itself recognized in *Ballew v. Georgia* that larger groups of factfinders are more reliable than smaller ones."[70]

At an even more fundamental level the *Smalley* court appears to overlook the essential principle underlying the *Apprendi* decision. The rationale of that opinion focuses on the defendant's constitutional right to jury trial and not the "reliability" of the resulting decisions. The Supreme Court did not reverse the trial judge's decision finding *Apprendi* had done the acts justifying an enhanced sentence because that determination was "unreliable." No, the Court did so because those facts had been determined by a judge rather than by a jury.

The same principle applies here. Reliable or not, a judge rather than a jury made the decision appellant had done the criminal acts leading to his juvenile adjudication. And that adjudication, in turn, dramatically increased appellant's sentence beyond that attaching to the offense of which the current jury convicted him. The juvenile court's adjudication finding appellant had committed "strike eligible" criminal acts is no more or less "reliable" than the *Apprendi* trial judge's finding the defendant in that case had committed acts justifying an enhanced sentence in that case. The "reliability" of the *Apprendi* judge's decision was not enough to save it from reversal by the Supreme Court for lack of a jury trial of those facts. Consequently, appellant's juvenile adjudication is no more deserving of immunity from the constitutional requirement a defendant enjoy the right of trial by jury as to all facts enhancing a sentence beyond the maximum for the current offense. The

---

[70] *Note, supra*, 116 Harv. L.Rev. 705, 709.

*Smalley* court's insistence juvenile adjudications do not offend the *Apprendi* principle because juvenile judges render "reliable" decisions is simply a *non sequitur.*

Our colleagues on Division Four and in the Fifth District, both in published decisions[71]—and several other California appellate courts in unpublished decisions—have taken fundamentally the same position as the Eighth Circuit did in *Smalley.* For reasons explained above, I differ with these courts, as I do with the majority opinion in this case.[72] They simply ignore how an "exception" for prior adult criminal convictions decided in earlier trials where defendants enjoyed the right to jury trial is consistent with *Apprendi*, while such an exception for prior juvenile adjudications decided without the opportunity for a jury trial is inconsistent with that opinion and its underlying principle.

Finally, the majority opinion argues the *Tighe* court only meant to suggest a jury trial was required to decide whether defendants actually had suffered a prior juvenile adjudication—rather than holding juvenile adjudications could not be used at all to enhance sentences because the underlying offense was not tried by a jury. In my view, this is a narrow although plausible reading of some ambiguous language in the *Tighe* opinion.[73] I note, however, it is not the reading given to the *Tighe* opinion by Division Four of this Court, by the Fifth District, by the Harvard Law Review, or even *United States v. Smalley.*

---

[71]*People v. Bowden* (2002) 102 Cal.App.4th 387 [125 Cal.Rptr.2d 513]; *People v. Fowler* (1999) 72 Cal.App.4th 581 [84 Cal.Rptr.2d 874].

[72] This dissent and *United States v. Tighe* are not quite alone, however. After thoroughly comparing the rationales of the Ninth Circuit and Eighth Circuit opinions, the Harvard Law Review recently came down squarely on the side of the Ninth Circuit's *Tighe* opinion. "Compared with the approach of *Smalley*, therefore, *Tighe's* understanding of the jury trial right is more consistent with the implications of the Supreme Court's recent jury trial jurisprudence." (Note, *supra*, 116 Harv. L.Rev. 705, 708.) The Harvard Law Review may not carry the weight of an appellate court opinion, but the quality and depth of its research certainly does—in this instance at least.

[73] The majority opinion reads the *Tighe* court's opinion as only requiring the present jury in the adult criminal case to decide a single, simple issue whether the defendant actually suffered a prior juvenile "conviction." If the jury decides this narrow question in the affirmative, the majority opinion argues, even under *Tighe* the trial court would be free to use the prior juvenile "conviction" as a "strike" to enhance the defendant's sentence for his present crime beyond the statutory maximum punishment for that crime. (Maj. opn., *ante*, at pp. 1076–1077.) Although admittedly certain language in the *Tighe* opinion can be interpreted this way, to so would be inconsistent with the basic rationale of that opinion. As is true of language in statutes, we are to construe the language in judicial opinions in context and in a way that is consistent with the logical construct of the overall document, be it a legislative act or a judicial opinion.

The *Tighe* opinion, correctly it seems to me, is based on a fundamental major premise. That premise? Trial judges cannot impose sentences greater than the statutory maximum for the present offenses except in those cases where the defendants were found guilty of committing the criminal acts justifying the greater sentences in proceedings where they had a right to jury trial. For adult criminal convictions, the minor premise—the defendants were found guilty in a

Yet even if my colleagues' interpretation of the Ninth Circuit's decision in *Tighe* were accurate, it would not detract from the logical validity of the constitutional argument set forth in this section of the dissent. The Supreme Court did say what the *Tighe* court said it said in the portions of the latter opinion quoted above—the fundamental principle *all* facts used to increase a defendant's sentence above the maximum provided for the crime of which the jury found him guilty must be submitted to and decided by a jury (if the defendant chooses). It likewise is true prior adult convictions were decided by juries (if the defendant requested same) and therefore satisfy the *Apprendi* principle. And it is also true as set forth in the language quoted above from the *Tighe* opinion, that the Supreme Court in *Jones v. United States*[74] and *Apprendi v. New Jersey*[75] explained the "exception" (which is not really an exception) for prior convictions is justified by the fact these convictions result from trials at which defendant enjoyed the right to trial by jury. And it likewise is true prior juvenile adjudications in California and most other states were decided without the benefit of a right to jury trial.

Consequently, I would be arguing the United States Constitution, especially the *Apprendi* line of cases interpreting that Constitution, forecloses the use of

proceeding where they had a right to jury trial—justifies enhancement beyond the maximum for current offenses. The minor premise applicable to "convictions" in juvenile court proceedings obviously does not.

Merely requiring the present jury to determine whether the defendant was "convicted" in a prior juvenile proceeding (necessarily without the right to jury trial) would in no sense cure the underlying problem—or fit the logical syllogism. The adverse minor premise would still be true—the juvenile court would have convicted the defendant in a proceeding where he lacked the right to jury trial. Indeed the fact a jury rather than a judge decides the juvenile "conviction" took place adds absolutely nothing to the constitutionality of the use of that conviction to enhance the present sentence. If a judge can constitutionally determine an adult conviction (where the defendant had a right to jury trial) occurred, nothing is gained by requiring a jury to make that determination when the "conviction" resulted from a juvenile trial (where the defendant lacked the right to jury trial.) The right to jury trial comes too late to cure the constitutional infirmity.

To accord the *Tighe* majority the credit it deserves for a logically consistent decision, and to read the phrase "fact of conviction" in context, it is necessary to interpret those words to mean "the underlying facts of the conviction." So interpreted, the *Tighe* opinion mandates one of two options. Either the juvenile "conviction" occurred in a proceeding where the defendant enjoyed the right to jury trial [as it would in ten or so states which guarantee the right to jury trial in juvenile court] *or* in the present proceeding the jury is required to consider and determine whether the defendant had committed the offense the judge found against him in the prior juvenile proceeding. Neither of those happened in the case before this court—or in *Tighe*. Consequently, in both cases the constitution prohibits the trial court from using the prior juvenile adjudication as a "strike" when sentencing the defendant in the present adult criminal proceeding. The *Tighe* decision struck the prior juvenile "conviction" and reduced the defendant's sentence accordingly in that case. We should do likewise in the case before this court.

[74] *Jones v. United States, supra,* 526 U.S. at page 249.

[75] *Apprendi v. New Jersey, supra,* 530 U.S. at page 496.

prior juvenile adjudications as "felony convictions" in California's three strikes sentencing scheme even if *United States v. Tighe* had never been decided. The Ninth Circuit's adoption of this line of reasoning might make it more persuasive, but that endorsement is not required to make it a sound interpretation of the United States Constitution.

For any and all of the several alternative independent and sufficient grounds discussed above, I would reverse appellant's "three strike" sentence. In my view, to tolerate such a punishment with two of the three qualifying offenses decided in proceedings where appellant lacked the right to jury trial offends both the United States and California Constitutions—and several hundred years of Anglo-American legal tradition as well.

A petition for a rehearing was denied August 13, 2003, and appellant's petition for review by the Supreme Court was denied October 22, 2003. Brown, J., did not participate therein. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.