Filed 7/29/21  P. v. Daniels CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B301038 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA106266) |
| v. | |
| JASON MONROE DANIELS, | ORDER MODIFYING OPINION |
| Defendant and Appellant. | [CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 26, 2021, be modified as follows:

1. On page 29, the paragraph under the heading "Additional Presentence Custody Credits" is deleted and the following paragraph is inserted in its place:

The sentencing hearing transcript shows the trial court miscalculated Daniels's presentence custody credits as 832 days. Daniels contends, and the People acknowledge, that he was

entitled to 847 days, having spent 847 days in actual custody. (See *People v. Heard* (1993) 18 Cal.App.4th 1025, 1027–1028.) A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.) Daniels's presentence custody credits award, and the abstract of judgment reflecting the award, shall be modified to award him 15 additional days, for a total award of 847 days of presentence custody credits.

2. On page 30, the text of the Disposition is deleted and the following disposition is inserted in its place:

We modify the judgment by striking the three one-year Penal Code section 667.5, subdivision (b) sentencing enhancements and adding 15 days of presentence custody credits for a total of 847 days of presentence custody credits. As modified the judgment is affirmed. The superior court is directed to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

This modification changes the judgment.

Appellant's petition for rehearing is denied.

NOT TO BE PUBLISHED.

LUI, P. J.          ASHMANN-GERST, J.          HOFFSTADT, J.

2

Filed 7/26/21 P. v. Daniels CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B301038 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA106266) |
| v. | |
| JASON MONROE DANIELS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith Levey Meyer, Judge. Modified and affirmed with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, and Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Blythe J. Leszkay and David W. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jason Monroe Daniels was convicted by a jury of second degree murder, felony child abuse, and possession of firearm by a felon. The jury found true firearm-use and prior conviction enhancements. On appeal, Daniels contends the trial court prejudicially erred in refusing to appoint advisory counsel and in revoking his pro se status, and made instructional errors requiring reversal. We modify the judgment to strike prior prison term enhancements pursuant to Senate Bill No. 136 (2019–2020 Reg. Sess.) and to reflect additional presentence custody credits. We affirm the judgment as modified.

## FACTS

On April 19, 2017, William Hayes suffered a fatal gunshot wound to his chest. The shooting occurred outside the home of Daniels's girlfriend Shawntee Falconer (Shawntee) and her family. Daniels had been residing with Shawntee until the afternoon of that day, when she kicked him out following an argument. Shawntee then went to work, and Daniels reentered the home in her absence. That night, Hayes showed up at the home unexpectedly to see Shawntee's two children, a 12-year-old daughter and a six-year-old son. Hayes had been their stepfather. He and the children visited outside. Shawntee was still at work.

Shawntee's brother and mother testified Daniels was visibly upset by Hayes's appearance. After Hayes arrived, Daniels told Shawntee over the phone, "I'm about to pop cuz." Daniels threw down the phone and walked outside to confront Hayes. Daniels produced a gun and shot Hayes once in the chest, narrowly missing Shawntee's son. The bullet struck Hayes in the heart, and he collapsed to the ground, where he was found by

2

police.[1]  Daniels immediately fled.  He was later arrested in Las Vegas.

Daniels testified he was unarmed when he confronted Hayes outside.  The children and other adults were inside the home.  Daniels realized Hayes was armed.  The two men struggled over Hayes's gun, and the weapon fired once and fell to the ground.  Hayes grabbed his arm or shoulder and entered the home.  Daniels picked up the gun, hid it in the garage, and drove away.

## PROCEDURE

Daniels made three unsuccessful attempts to replace his appointed counsel before trial (*People v. Marsden* (1970) 2 Cal.3d 118).  Thereafter, his request to represent himself was granted (*Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*)).  The trial court relieved the public defender's office and appointed standby counsel, who was present during trial.

In pretrial proceedings, Daniels was verbally combative with the trial court.  On one occasion, he refused to leave his holding cell, prompting the trial court to admonish Daniels that his pro se status could be revoked if he refused to comply with court orders.  During voir dire, the court made a point of giving Daniels a general advisement that if he refused to leave the holding cell "or anything like that" during trial, his pro se status could be revoked.

---

[1] Shawntee's brother and mother each telephoned 911. Audio recordings and transcripts of the phone calls were provided to the jury.

When trial was under way, Daniels accused the trial court of "side-track[ing]" him, "disrespect[ing]" him, or infringing his constitutional rights. He also berated the court when rulings were not in his favor. Daniels engaged in two separate outbursts in front of the jury. Each time, the court warned Daniels that his pro se status could be terminated. Daniels's third outburst happened during his closing argument. The court revoked his pro se status, and standby counsel completed Daniels's closing argument.

A jury convicted Daniels of second degree murder (Pen. Code, § 187, subd. (a)[2]), felony child abuse (§ 273a, subd. (a)), and possession of a firearm by a felon[3] (§ 29800, subd. (a)(1)). The jury found true enhancement allegations that Daniels had personally and intentionally discharged a firearm when committing the murder (§ 12022.53, subd. (d)) and had personally used a firearm when committing the child abuse (§ 12022.5, subd. (a)). The jury also found true special allegations that Daniels had suffered two prior violent or serious felony convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12) and two prior serious felony convictions under section 667, subdivision (a), and had served four separate prison terms for felonies (§ 667.5, subd. (b)). Daniels was sentenced to an aggregate state prison term of 122 years to life. This appeal followed.

---

[2] All further statutory references are to the Penal Code.

[3] Daniels stipulated to having a prior felony conviction for purposes of the charge of possession of a firearm by a felon.

4

# DISCUSSION

## 1. Denial of Advisory Counsel

### A. *Additional Facts*

In his written motion, Daniels's stated grounds for appointment of advisory counsel were: (1) "the law library in the facility in which the defendant is being held has limited resources"; (2) the "defendant does not have access to the witnesses and the evidence in this case"; and (3) the assistance of advisory counsel "will aid the defendant in preparing his case for trial."

Before ruling on Daniels's request, the trial court and Daniels engaged in the following discussion:

"The Court: You're asking for advisory counsel?

"[Daniels]: Yes.

"The Court: Thank you. [¶] Your request is denied. You don't get advisory counsel. [Kieran Brown is] just what we call back-up counsel. So that's the deal. Let me just be clear. You can ask for your pro per status to be revoked—or you can give it up, and I give you an attorney.

"[Daniels]: I understand that.

"The Court: But you don't get both.

"[Daniels]: Well, the state's Constitution says otherwise.

"The Court: I disagree. I'm denying it.

"[Daniels]: Okay.

"The Court: I disagree that that's what the Constitution says.

"[Daniels]: But it's in there.

"The Court: But my feeling is you're interpreting it wrong. We don't do that, and you're not 'entitled' under the Constitution to advisory counsel. You're not even entitled to back-up counsel.

5

Yet, we do that more as a convenience for the court, that if in the middle of trial, and you feel that you get in over your head, then I will revoke your pro per status and let a completely unprepared attorney continue your case.

"[Daniels]: Well, that's not—

"The Court: That's how it works.

"[Daniels]: That's—

"The Court: Or you can stop being pro per and get an attorney, which I will appoint the public defender's office to continue to help you again. [¶] Is that what you want?

"[Daniels]: No, ma'am.

"The Court: Okay. Then your request is denied.

"[Daniels]: Once again, the state's Constitution has awarded me that because of limited access to certain law material.

"The Court: I disagree with that interpretation. Okay. . . . [T]he court is denying this motion."

Jury trial commenced about a month later. Daniels represented himself through most of the trial, and standby counsel was present during the proceedings.

### B. *Relevant Legal Principles*

Criminal defendants have a constitutional right to represent themselves at trial. (*Faretta, supra,* 422 U.S. at pp. 817–818.) But criminal defendants do not have a constitutional right to advisory counsel. (*People v. Mattson* (1959) 51 Cal.2d 777, 795, overruled on another ground in *People v. Taylor* (2009) 47 Cal.4th 850, 871; *People v. Moore* (2011) 51 Cal.4th 1104, 1119–1120 (*Moore*); accord, *McKaskle v. Wiggins* (1984) 465 U.S. 168,183 [104 S.Ct. 944, 79 L.Ed.2d 122] (*McKaskle*).)

6

Daniels argues the California Supreme Court, particularly in *Moore*, improperly relied on dicta in *McKaskle*, which does not support that conclusion. We are, however, compelled to follow our Supreme Court's repeated holdings that the Sixth Amendment does not give a criminal defendant a right to advisory counsel or any other hybrid form of representation. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455–456 [intermediate court bound to follow binding precedent of higher reviewing court and refusal to do so is in excess of intermediate court's jurisdiction]; *People v. Smith* (2003) 110 Cal.App.4th 1072, 1091 [same].)

A trial court may exercise its discretion to appoint advisory counsel. (*People v. Crandell* (1988) 46 Cal.3d 833, 861 (*Crandell*), abrogated on another ground by *People v. Crayton* (2002) 28 Cal.4th 346, 364–365; accord, *People v. Miracle* (2018) 6 Cal.5th 318, 338.) Various factors that the court may consider include the defendant's education, familiarity with the criminal justice system, and demonstrated legal abilities; the defendant's reasons for seeking advisory counsel, including evidence of a manipulative purpose; the seriousness of the charges; and the complexity of the issues. (*People v. Debouver* (2016) 1 Cal.App.5th 972, 976.) We review the decision for abuse of discretion and will only set it aside if it is "arbitrary, capricious, or whimsical." (*Ibid.*)

A trial court's failure to exercise discretion, however, is necessarily an abuse of discretion. (*People v. Bigelow* (1984) 37 Cal.3d 731, 743; see *Crandell, supra,* 46 Cal.3d at p. 861.) We review such error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), to determine whether the denial of advisory counsel under the particular circumstances would have been an

abuse of discretion.  If not, no constitutional right is implicated.
(*Watson*, at pp. 864–865.)

C. ***Trial Court's Denial of Daniels's Request To Appoint Advisory Counsel Was Not Prejudicial***

Daniels argues the trial court failed to exercise its discretion in refusing to appoint advisory counsel.  We agree.  Daniels's motion was summarily denied; there is no evidence the court evaluated any relevant factors to determine whether the appointment of advisory counsel was justified.  (See *Crandell, supra*, 46 Cal.3d at p. 862.)  The court correctly stated Daniels was not entitled to advisory counsel, but it apparently did not understand that appointment of advisory counsel was a discretionary choice.  The court mistakenly believed a defendant must either proceed in pro se or be represented by counsel.

Nonetheless, the record shows it would not have been an abuse of discretion had the trial court exercised its discretion in denying Daniels's request for advisory counsel.  (*People v. Clark* (1992) 3 Cal.4th 41, 111–112.)  Daniels was 34 years old and a high school graduate.  He also had extensive experience with the legal system, having multiple prior convictions and time spent on parole.

In representing himself, Daniels consistently "proved to be an aggressive, thorough, and skillful advocate."  (*Crandell, supra,* 46 Cal.3d at p. 865.)  Before seeking advisory counsel, Daniels made a variety of pretrial motions, which he capably drafted and argued, including two *Pitchess* motions (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531), a motion to set aside the information, and a motion to exclude evidence of his prior convictions.  Daniels also secured the assistance of two investigators, the second one after the first one was relieved for

8

health reasons; formal and informal discovery from the prosecutor; three transcripts of pretrial proceedings; the filing of several subpoenas; a two-week continuance of the trial; two different expert witnesses, although only one of them testified; and ex parte communications with the court. Daniels also filed motions alleging vindictive prosecution and judicial bias.

At trial, Daniels participated in voir dire and the conference on jury instructions, made an opening statement, vigorously cross-examined prosecution witnesses, and persuaded the trial court to have witnesses testify at an evidentiary hearing. Daniels also introduced trial exhibits, an expert witness, and his own testimony to support his defense. Until his pro se status was revoked, Daniels presented a closing argument. Moreover, this case did not involve highly complex legal issues, but instead turned on witness credibility as acknowledged and addressed by Daniels's self-prepared defense. (See *People v. Clark, supra,* 3 Cal.4th at p. 111.) It is not reasonably probable that had advisory counsel been appointed, Daniels would have obtained a more favorable result. (*Watson, supra,* 46 Cal.2d at p. 826.)

## 2. Revocation of Pro Se Status

### A. *Additional Facts*

Daniels's pro se status was revoked following three separate outbursts in front of the jury. The first outburst occurred on July 5, 2019. Outside the presence of the jury, Daniels had been told by the trial court that his "Sixth Amendment issues" would be addressed after the coroner's testimony. When the jury entered the courtroom, Daniels announced he wanted to return to the holding cell, his issues needed to be raised in front of the jury, and the court was violating his constitutional rights by not addressing them.

9

The trial court had the jury leave the courtroom and gave Daniels the option of expressing his issues "now." Daniels became upset when told to speak more slowly for the court reporter, and he again insisted on returning to the holding cell. The court admonished that if he left, his pro se status would be revoked. Daniels continued to complain about the court's obligation to consider his issues immediately and insisted the court was "trying to upset" him. Daniels claimed to be suffering from PTSD, and the court agreed to allow him to briefly leave the courtroom. When Daniels returned, the court confirmed he was still representing himself but was "on notice."

The second outburst occurred on July 8, 2019. Outside the presence of the jury, the trial court repeatedly informed Daniels that he had to decide whether he wanted to testify. Daniels did not answer and complained the court was violating his constitutional rights and committing misconduct by not allowing a police interview of Shawntee's six-year-old son to be admitted into evidence.[4] The court told Daniels the jury was entering the courtroom and if he refused to stop talking, his pro se status would be revoked.

After the jury entered the courtroom, the prosecution rested. The trial court asked Daniels whether he wished to testify. Daniels said, "Yes, I do," but insisted that he needed to call additional unnamed witnesses. The court twice inquired whether Daniels wanted to testify, " 'yes' or 'no.' " Daniels answered the court was violating his Sixth Amendment rights. The court revoked Daniels's pro se status, called upon standby

_____

[4] Neither the son nor the interviewing officer had been subpoenaed.

counsel, and had the jury leave the courtroom.  At that point, Daniels said he wanted to testify because he was "tired of these games."  The court permitted him to continue representing himself.  Daniels proceeded to testify.

During closing argument the same day, Daniels repeatedly told the jury that his defense was hampered by his inability to play a recording of the police interview of Shawntee's six-year-old son.  The court sustained the prosecutor's objection for improper argument.  The following exchange occurred:

"[Daniels]:  Improper argument?  Come on, man.
"The Court:  It is.
"[Daniels]:  How is it improper?  No one heard [the son] say he—nothing happened to him—but you guys.  So how can I express that fact that nothing happened to him, and he simply said it.
"The Court:  Sir, I'm done.
"[Daniels]:  No, I'm not done.
"The Court:  Well then, I'm going to just stop you and have the final argument—
"[Daniels]:  How can you do that?  That would be—see, you've done this over and over.
"The Court:  All right.  Thank you.  You're done.  [¶]  Any final rebuttal or submit?
"[Daniels]:  You see this shit?  No.  Do you see this shit?  I can't even express my story.  I can't—No.  This is the rest of my life right here.  Do you understand that?
"The Court:  Final rebuttal?
"[Prosecutor]:  Yes, Your Honor.  It will be very brief.
"[Daniels]:  This is the rest of my life here.  And—
"The Court:  Sir—

11

"[Daniels]: I'm not able to—I'm not able to say my peace [*sic*]. You've been doing this ever since I've been in your courtroom.

"The Court: All right. Three is a charm. You're out. [¶] Mr. Brown, come on in.

"[Daniels]: At this time, I really don't give a fuck. You're disrespectful, and you've been doing this to me this whole time. You've been doing this this whole time, [Judge] Meyers [*sic*], and you upset because I disqualified you for calling me a liar.

"The Court: Mr. Brown, would you like to finish the closing argument?

"[Daniels]: That's what you're going through right now. Get me out of this courtroom dude.

"The Court: If you can't be quite [*sic*], I'm going to have you removed from the courtroom.

"[Daniels]: Man, I'm going to get out of the courtroom because you—you—you simply—I'm—I'm sorry, ladies and gentlemen.

"The Court: Thank you sir. [¶] You're out. If you don't want to stay for your closing argument—

"[Daniels]: Man, look you don't to have [*sic*] say nothing else to me.

"The Court: Thank you, sir.

"[Daniels]: This is bullshit. This is bullshit. Hey look man. I feel sorry for your soul when God comes for you. I do. [¶] And for the record, I don't give up my pro per status. Mr. Kieren [*sic*], you can say—

"The Court: The court has now revoked your pro per status for the third outburst.

"[Daniels]: Well, like I said—

"The Court: Take him out, please.

"[Daniels]: You can't revoke it without a hearing. You can't revoke it without a hearing.

"The Court: I just did."

Standby counsel Kieran Brown completed the defense argument to the jury, followed by the prosecutor's closing argument. The court gave final instructions, and the jury began deliberating.

### B. *Relevant Legal Principles*

A trial court may terminate a defendant's right of self-representation "for misconduct that seriously threatens the core integrity of the trial." (*People v. Carson* (2005) 35 Cal.4th 1, 6 (*Carson*); *Faretta, supra*, 422 U.S. at p. 834, fn. 46; *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1515.) A ruling revoking a defendant's pro se status is reviewed for abuse of discretion, and will not be disturbed absent a strong showing of clear abuse. (*Carson*, at p. 12; *People v. Doss* (2014) 230 Cal.App.4th 46, 54.) We "accord due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial in determining whether termination of *Faretta* rights is necessary to maintain the fairness of the proceedings." (*Carson,* at p. 12; *Doss,* at p. 54.)

In *Carson*, the Supreme Court explained: "Whenever 'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a trial' [citation] or to compromise the court's ability to conduct a fair trial [citation], the defendant's *Faretta* rights are subject to forfeiture. Each case must be evaluated in its own context, on its own facts." (*Carson, supra*, 35 Cal.4th at p. 10.) *Carson* enumerated several factors relevant to this

13

analysis. In addition to the nature of the misconduct and its impact on the trial proceedings, other considerations include (1) whether the defendant was warned that particular misconduct would result in termination of pro se status; (2) whether the defendant has intentionally sought to disrupt and delay his trial; (3) the actual effect of the misconduct; and (4) the availability and suitability of alternative sanctions. (*Ibid.*)

Daniels tries to characterize his behavior as mere "overzealous advocacy" as opposed to intentionally disruptive. He also argues his purported misconduct was not egregious enough to be obstructionist, especially since it occurred near the end of the trial. This argument may have been stronger had Daniels's misconduct been limited to a few isolated instances. But throughout the trial, Daniels continuously ignored the rules of evidence and rejected the trial court's orders not to mention certain evidence or relitigate discovery issues.

Daniels was also on notice of the consequences of his disruptive behavior. Before and during trial, Daniels was repeatedly warned that if he insisted on leaving the courtroom, refused to abide by court rulings or to comply with court protocol his pro se status would be revoked. Nonetheless, Daniels's persistent response was his constitutional rights were being violated. (The court is "fucking violating my rights.") Daniels also repeatedly accused the court of judicial bias. ("You're purposely doing what you're doing to upset me. It's been that way ever since . . . we started this.")

Moreover, as the trial court expressly found, Daniels's misconduct was intended to be disruptive. ("What you're doing is trying to get a mistrial or set up something for an appeal, and I understand that." "So it appears to me that you're trying to ask

14

him questions trying to set up an appeal in regards to issues that have occurred between you and me and discovery on this case.") Indeed, the increasing frequency and intensity of Daniels's defiant behavior as the trial progressed suggested "a deliberate course of conduct designed to cause as much disruption as possible," particularly in front of the jury. (*People v. Clark, supra,* 3 Cal.4th at p. 116.)

Daniels also maintains the trial court failed to consider alternatives to termination of his propria persona status. However, we agree there was no satisfactory sanction short of revocation, given Daniels's persistent disregard of the court's orders. Contrary to Daniels's argument, a brief recess followed by another warning was not a satisfactory alternative. That option had already proved ineffective, and the court reasonably believed Daniels would continue to disrupt closing argument. Daniels claims the court could have terminated his propria persona privileges, rather than his pro se status.[5] However, the obstructionist misconduct took place at the trial itself, making such an alternative sanction less feasible.

The trial court was exceedingly patient with Daniels and bent over backward to accommodate his wishes and to ensure his rights as a pro se defendant. However, Daniels's repeated, willful failure to abide by the court's evidentiary and discovery rulings

---

[5] Propria persona privileges are afforded self-represented defendants who are incarcerated. Standard propria persona privileges include the use of the law library and telephones for a specified number of hours, the opportunity to interview witnesses for extended periods, and the use of and conferences with legal runners and investigators. (See *Wilson v. Superior Court of Los Angeles County* (1978) 21 Cal.3d 816, 822.)

15

undercut the court's control of the proceedings, and thereby threatened the core integrity of trial. (See § 1044.) The court did not abuse its discretion in revoking Daniels's pro se status.

**3.     Alleged Instructional Errors**

Daniels argues the trial court erred by failing to sua sponte instruct the jury on (1) voluntary manslaughter on an imperfect self-defense theory, (2) involuntary manslaughter on a criminal negligence theory, (3) accidental discharge of a weapon, and (4) misdemeanor child abuse. He also contends the trial court improperly instructed the jury on perfect self-defense using CALCRIM No. 505. Daniels argues the purported errors violated his rights to due process and a fair trial, and require reversal. We disagree.

**A.     *Additional Facts***

The trial court instructed the jury on second degree murder, felony child abuse, possession of a firearm by a felon, and the two firearm-use enhancements. Without objection, the court also instructed the jury sua sponte on perfect self-defense pursuant to CALCRIM No. 505. Daniels did not request the lesser included offenses and accidental discharge instructions he now contends should have been given sua sponte.

**B.     *Relevant Legal Principles***

A trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses, and defenses on which the defendant relies and that are not inconsistent with his theory of the case, whether or not the defendant makes a formal request. (*People v. Moye* (2009) 47 Cal.4th 537, 548.) Instruction on a lesser included offense is required when there is evidence the defendant is guilty of the lesser offense, but not the greater. (*People v.*

16

*Whalen* (2013) 56 Cal.4th 1, 68.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.) The existence of *any* evidence, no matter how weak, will not justify instructions on a defense or a lesser included offense. (*Whalen,* at p. 68.) In deciding whether there is substantial evidence we do not evaluate the credibility of the witnesses, a task for the jury. (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.)

We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense or a defense. (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

### C. *Substantial Evidence Did Not Support Imperfect Self-defense Instruction*

"The doctrine of self-defense embraces two types: perfect and imperfect." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) "Perfect" self-defense, which exonerates a defendant completely, requires that he had an honest and reasonable belief that the use of force was necessary to defend against an imminent threat of bodily injury against himself or another, and that he used no more force than was necessary to defend against that threat. (§ 197, subd. (1); *Rodarte,* at p. 1168.) Imperfect self-defense "is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury." (*People v. Booker* (2011) 51 Cal.4th 141, 182.) Imperfect self-defense is not a complete defense to a killing, but negates malice and reduces the offense to voluntary manslaughter. (*Ibid.*)

Although the trial court instructed the jury sua sponte on perfect self-defense, it was inapplicable. There was no substantial evidence from which the jury could have found

17

Daniels acted in self-defense, and the instruction ran counter to his defense at trial. Daniels was the only defense witness to the shooting. Daniels testified he "kind of got upset" when he went outside and demanded that Hayes leave. Hayes did not respond. The two men stood face to face about three feet apart. Hayes's arms were down by his sides. Daniels then heard a "click," looked down, and saw Hayes begin to raise his left arm. Daniels immediately grabbed Hayes's left wrist and felt a gun in Hayes's fist. As Hayes continued to raise his arm, Daniels grabbed both of Hayes's wrists and elbowed Hayes in the head. Daniels then "pull[ed]," Hayes "shoved," and the gun fired and fell to the ground. Daniels testified, "Like I didn't do nothing"; and when "the gun goes—pow[,] I'm not in control of the gun. [Hayes] is." Daniels denied killing Hayes. His testimony was that Hayes was alive—grasping his arm or shoulder and entering the home after the shooting.

Daniels did not testify that he intentionally shot Hayes, killing him, because he believed deadly force was required to defend himself. He did not admit to having shot Hayes at all. Instead, Daniels testified, in effect, that the gun accidentally discharged when he and Hayes were struggling over it. He also suggested that it was Hayes who unintentionally caused the gun to fire. Crediting Daniels's account, the shooting was purely accidental on his part. In general, an accidental shooting is inconsistent with an assertion of self-defense. (See, e.g., *People v. Villanueva* (2008) 169 Cal.App.4th 41, 50; *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357 ["self-defense imports an intentional shooting; it does not apply to an accidental one"].) Thus, absent evidence Daniels intentionally fired the gun at Hayes because he

18

was in actual fear for his life, a perfect self-defense instruction was not warranted.

Daniels contends the trial court erred by failing to instruct the jury sua sponte on voluntary manslaughter on an imperfect self-defense theory for two reasons. First, Daniels cites those opinions which hold whenever a jury is instructed on perfect self-defense, the trial court must also give an imperfect self-defense instruction. (Relying on *People v. Ceja* (1994) 26 Cal.App.4th 78, 88–89 (conc. opn. of Johnson, J.), disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92; *People v. DeLeon* (1992) 10 Cal.App.4th 815, 825 (conc. opn. of Johnson, J.); but see *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1273 [distinguishing the cases and rejecting this premise], cited with approval in *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834, overruled on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214, and *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1231.) We reject this reason out of hand, having concluded insufficient evidence supported the perfect self-defense instruction.

For his second reason, Daniels offers a third version of the shooting. Daniels argues the jury might have rejected his testimony and concluded instead he intentionally shot Hayes in the actual, but unreasonable belief that Hayes was about to shoot him. What Daniels asserts, in essence, is the trial court, in deciding what instructions to give the jury, was required to conflate two conflicting versions of events, neither of which alone supported voluntary manslaughter on an imperfect self-defense theory, and to divine a hypothetical "third" version that could support it. While it may be true, as an abstract principle, that a jury may believe parts of a witness's testimony and reject others

19

(*People v. Wader* (1993) 5 Cal.4th 610, 641), for an instruction on a defense theory to be required, there must still be substantial evidence in the entire record to support it. (*People v. Elize* (1999) 71 Cal.App.4th 605, 615.) Speculation is insufficient to require an instruction on a lesser included offense. (*People v. Simon* (2016) 1 Cal.5th 98, 132; *People v. Yarbrough* (1974) 37 Cal.App.3d 454, 457 [no involuntary manslaughter instruction based on hypotheticals].)

### D. *Lack of Involuntary Manslaughter and Accidental Discharge Instructions Was Not Prejudicial*

#### (1) Involuntary Manslaughter

Daniels contends the trial court should have instructed the jury sua sponte on the lesser included offense of involuntary manslaughter on a criminal negligence theory. Manslaughter is "the unlawful killing of a human being without malice." (§ 192.) Involuntary manslaughter, excluding vehicular manslaughter, is "the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) " 'The words "without due caution and circumspection" refer to criminal negligence— unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences.' " (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.)

Daniels argues the jury reasonably could have found the gun was fired accidentally due to his criminal negligence in handling the gun. Specifically, Daniels contends "grab[bing] Hayes's arms and struggl[ing] for control of the weapon"

20

"rendered the homicide unintentional and reduced the offense to involuntary manslaughter."

Even if we assume the evidence was sufficient to require an instruction on involuntary manslaughter, any error in failing to give that instruction was harmless. Failure to instruct on a lesser included offense in a noncapital case is reviewed for error under *Watson, supra,* 46 Cal.2d at page 836. (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) "[T]he error is harmless unless there is a reasonable probability of a different result absent the error." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 200, fn. 4.) " 'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 814.)

The evidence in the case before us was compelling. In convicting Daniels of second degree murder, the jury reasonably rejected his attempt to portray Hayes as the aggressor in the shooting. The testimony of Shawntee, her mother Lorraine Jackson, her 12-year-old daughter, who were not impeached, established Daniels, who was angered by Hayes's visit, accosted Hayes, shot and killed him, and fled. According to the uncontroverted testimony of a police officer, Daniels was later arrested in Las Vegas. These circumstances demonstrate the shooting was not accidental.

21

Daniels's own testimony was riddled with assertions that strained credulity. He claimed Hayes grabbed his arm or shoulder after being shot and then entered the home. He claimed to have overheard Jackson and Hayes saying "for his ass" in reference to Daniels before the shooting occurred. He claimed to have picked up the gun by the barrel after the shooting, and told Shawntee he had hidden it in the garage so police could find Hayes's DNA on it.[6] He claimed to have purchased "tickets" in advance of the shooting to travel with Shawntee to Las Vegas as part of a job transfer. He claimed Shawntee told him that she had been arrested.

Furthermore, "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085–1086; see *People v. Jones* (1991) 234 Cal.App.3d 1303, 1315–1316, disapproved on another ground in *People v. Anderson* (2011) 51 Cal.4th 989, 998, fn. 3.) Here, the jury was properly instructed on the prosecution's burden of proof beyond a reasonable doubt, the elements of the offenses with which Daniels was charged, and the findings that were required to find the firearm enhancements. The jury had an opportunity to determine Daniels's killing of Hayes was justified in self-defense, but declined to do so. By convicting Daniels instead of second degree murder, the jury necessarily found he

---

[6] The gun was never recovered. Shawntee testified on rebuttal that she did not recall having a phone conversation with Daniels while he was in custody about finding anything in the garage.

acted with malice.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 [Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder.  Malice may be express (intent to kill) or implied (intentional commission of life-threatening act with conscious disregard for life)].)

Additionally, by finding Daniels intentionally, not accidentally, discharged his gun causing death within the meaning of section 12022.53, subdivision (d), the jury necessarily rejected a prerequisite for finding defendant guilty of involuntary manslaughter.  (§ 12022.53, subd. (d) [applies to "any person who, in the commission of a felony . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . , or death, to any person other than an accomplice"].)

Under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705], we evaluate whether, if the jury was properly instructed, it is beyond a reasonable doubt that the verdict would have been the same.  Even if *Chapman* were applicable in this case, we would find the error harmless beyond a reasonable doubt for the reasons stated.

### (2)    Accidental Discharge

Daniels argues the trial court erred by failing to instruct the jury on accidental discharge of a firearm while acting in self-defense.  Daniels concedes the California Supreme Court has held that it is a pinpoint instruction, which a trial court has no duty to give sua sponte.  (*People v. Anderson, supra,* 51 Cal.4th at p. 996; *People v. Jennings* (2010) 50 Cal.4th 616, 674.)  Daniels acknowledges we are bound by these precedents (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 55), but

23

invites us to disagree with them to preserve the issue for future review.  We decline to do so.

### E.     *CALCRIM No. 505*

Daniels contends the jury was improperly instructed on perfect self-defense in violation of his rights to due process and jury trial.  Daniels asserts CALCRIM No. 505 is flawed because it erroneously allowed the jury to find Daniels shot Hayes in self-defense only if Daniels "belie[ved] there was imminent danger of death or great bodily injury [to himself]."[7]

In *People v. Nguyen* (2015) 61 Cal.4th 1015, the California Supreme Court recognized a defendant who engages in a lethal response to imminent deadly force cannot claim self-defense if "he did not act on the basis of fear alone but also on a desire to kill." (*Id.* at p. 1044.)  *Nguyen* cited with approval the Fifth District's

---

[7] CALCRIM No. 505 provides in pertinent part:  "The defendant is not guilty of murder if he was justified in killing someone in self-defense.  The defendant acted in lawful self-defense if:  [¶]  1.  The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;"  [¶]  2.  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;  [¶]  AND  [¶]  3.  The defendant used no more force than was reasonably necessary to defend against that danger.  [¶]  Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of death or great bodily injury to himself.  Defendant's belief must have been reasonable and he must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the killing was not justified."

24

holding in *People v. Trevino* (1988) 200 Cal.App.3d 874 (*Trevino*) that former CALJIC No. 5.12 (the predecessor instruction to CALCRIM No. 505) correctly stated the law of perfect self-defense by requiring the party who killed must have had an honest and reasonable belief in the need for self-defense or the defense of another, and, in killing, must have " '*acted under the influence of such fears alone.*' " (*Nguyen,* at p. 1045, italics added, quoting *Trevino,* at p. 879; §§ 197, 198.) *Trevino* further suggested, if at the time the defendant also harbored emotions other than (and in addition to) fear toward the victim which did not *cause* the defendant to commit the crime, the defendant could request additional, clarifying instructions regarding the presence of those other, mixed motives. (*Trevino,* at p. 880.)

Daniels argues *Trevino* was wrongly decided and CALCRIM No. 505 is not an accurate statement of the law as reflected in sections 197 (justifiable homicide), 198 (requiring reasonable fear), the common law, and the California and federal Constitutions. He maintains the jury should have been instructed that "a homicide based on mixed motives is justifiable so long as reasonable fear was a substantial cause of the decision to kill." And, "given the evidence of multiple potential motivations for Daniels's actions toward Hayes, there is a strong likelihood at least some jurors rejected self-defense on the grounds a small portion of the emotion that animated Daniels was anger or jealously toward Hayes."

We reject Daniels's argument for several reasons. First, Daniels forfeited his challenge to CALCRIM No. 505. " '[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or

25

amplifying language.' " (*People v. Jones* (2013) 57 Cal.4th 899, 969.)  Second, as discussed, on this record Daniels was not entitled to a perfect self-defense instruction, so it amounted to a windfall.  (See *People v. Szadziewicz, supra,* 161 Cal.App.4th at p. 834.)  Third, if CALCRIM No. 505 did apply here, we would disagree with Daniels and would follow *Trevino.*  In our view, CALCRIM No. 505 correctly states the law of self-defense under sections 197 and 198 and does not give preclusive effect to "mixed motives."  As the *Trevino* court aptly acknowledged:  "[A] person who feels anger or even hatred toward the person killed, may . . . justifiably use deadly force in self-defense. . . .  [¶]  In [some] situations . . . it would be unreasonable to require an absence of any feeling other than fear, before the homicide could be considered justifiable.  Such a requirement is not a part of the law . . . .  Instead, the law requires that the party killing act out of fear alone."  (*Trevino, supra,* 200 Cal.App.3d at p. 879, italics omitted.)  However, as the form instruction does not "eliminate a feeling of anger or any other emotion so long as that emotion was not part of the cause of the use of deadly force," it correctly stated the law of perfect self-defense.  (*Id.* at p. 880.)

Like former CALJIC No.5.12 contested in *Trevino*, CALCRIM No. 505, as instructed here, did not remove the possibility that Daniels harbored other negative feelings about Hayes.  Nor did the form instruction advise the jury it had to reject self-defense if Daniels felt some hostility or jealousy apart from fear.  Instead, in keeping with section 198, CALCRIM No. 505 requires that Daniels's fear for his life is the sole "but for" cause of the murder, and is an accurate and complete statement of the law.

26

**F.     *Substantial Evidence Did Not Support Misdemeanor Child Abuse Instruction***

The trial court instructed the jury on felony child abuse. Daniels did not request an instruction on misdemeanor child abuse and now contends the court had a duty sua sponte to give the instruction on the lesser included offense.

"Section 273a defines both felony and misdemeanor child abuse. The criminal acts proscribed by section 273a are: (1) willfully causing or permitting any child to suffer, or (2) inflicting thereon unjustifiable physical pain or mental suffering, or (3) having the care or custody of any child, willfully causing or permitting the person or health of such child to be injured, or (4) willfully causing or permitting such child to be placed in such situation that his or her person or health is endangered." (*People v. Moussabeck* (2007) 157 Cal.App.4th 975, 980 (*Moussabeck*).)

In *Moussabeck* the Court of Appeal explained the difference between felony child abuse and misdemeanor child abuse: "If the act is done under circumstances or conditions likely to produce great bodily injury or death, it is a felony (§ 273a, subd. (a)); if not, the offense is a misdemeanor (§ 273a, subd. (b)). [Citation.] Misdemeanor child abuse . . . is a lesser included offense of felony child abuse." (*Moussabeck, supra*, 157 Cal.App.4th at p. 980.)

The issue here is whether there is substantial evidence from which a reasonable jury could find Daniels committed misdemeanor child abuse but not felony child abuse to demonstrate instructional error. (*People v. Whalen, supra,* 56 Cal.4th at p. 68.) If there is no such evidence, the court had no duty to give the lesser included offense sua sponte. (*Ibid.*)

27

Daniels testified Shawntee's son and daughter were inside the home at the time of the shooting. If the jury had credited his testimony, it would have found no child abuse had occurred. Shawntee's mother, Lorraine Jackson, testified her six-year-old grandson (Shawntee's son) was standing "next to" or "pretty close" to Hayes, and yelled, "He shot him. He shot him" after Daniels fired the gun. Shawntee's 12-year-old daughter testified when Daniels pointed the gun at Hayes, her brother was "on [Hayes's] back," "kind of just playing around." Shawntee testified her son was severely troubled by the shooting, had developed behavioral issues, and was still in counseling at the time of trial.

We see no evidence, let alone substantial evidence, from which a jury could reasonably find only misdemeanor child abuse was committed. Daniels fired a gun killing Hayes, when Shawntee's son was on or beside Hayes, seriously endangering the boy's life. No lesser included offense instruction was required.

**4.    Senate Bill No. 136**

Daniels and the People agree that because of the passage of Senate Bill No. 136, the three one-year consecutive sentencing enhancements under section 667.5, subdivision (b) must be stricken.

At the time Daniels was sentenced, the trial court was required to impose one-year prior prison term enhancements. (Former § 667.5, subd. (b).) But, in 2019, Senate Bill No. 136 (2019–2020 Reg. Sess.) was passed. It changed this enhancement so that it would apply only to prior prison terms for certain sexually violent offenses. (§ 667.5, subd. (b); *People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) This change went into effect on

January 1, 2020.  (*People v. Camba* (1996) 50 Cal.App.4th 857, 865.)

The change in the law applies retroactively to this case. When the Legislature eliminates or reduces the punishment for an offense or a sentence enhancement, that reduction is applied retroactively to all judgments on appeal that are not yet final. (*In re Estrada* (1965) 63 Cal.2d 740, 745–748.)  Consequently, because Daniels's prior prison terms were not for a sexually violent offense, the section 667.5, subdivision (b) enhancements must now be stricken.  (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 772.)

**5.    Additional Presentence Custody Credits**

The sentencing hearing transcript shows the trial court miscalculated Daniels's presentence custody credits as 832 days. Daniels contends, and the People acknowledge, that he was entitled to 842 days, having spent 842 days in actual custody. (See *People v. Heard* (1993) 18 Cal.App.4th 1025, 1027–1028.)  A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered.  (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)  Daniels's presentence custody credits award, and the abstract of judgment reflecting the award, shall be modified to award him 10 additional days, for a total award of 842 days of presentence custody credits.

## DISPOSITION

We modify the judgment by striking the three one-year Penal Code section 667.5, subdivision (b) sentencing enhancements and adding 10 days of presentence custody credits for a total of 842 days of presentence custody credits. As modified the judgment is affirmed. The superior court is directed to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

HOFFSTADT, J.

30